[No. G042008. Fourth Dist., Div. Three. Feb. 7, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
SIDNEY NATHANIEL LANDAU, Defendant and Appellant.

6

**COUNSEL**

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Bradley A. Weinreb and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—Prior to appellant Sidney Nathaniel Landau's release on parole after his latest convictions for sex offenses committed on a child under 14 years of age, the Orange County District Attorney filed a petition to have him committed as a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA), Welfare and Institutions Code section 6600 et seq.[1] More than seven years after the filing of the petition, the third jury to hear the matter found appellant met the criteria for commitment as an SVP. Appellant raises a multitude of issues on appeal, including inter alia, that he was denied due process when he was not brought to trial in a timely manner, he was denied due process when his initial SVP evaluators used unlawful underground regulations, he was denied effective assistance of counsel, the court should have suppressed evidence obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures, the court prejudicially erred when it ordered appellant to submit to mental examinations by experts retained by the district attorney, and the present SVPA violates equal protection, due process, ex post facto, and double jeopardy.

While the appeal was pending, the California Supreme Court decided *People v. McKee* (2010) 47 Cal.4th 1172 [104 Cal.Rptr.3d 427, 223 P.3d 566] (*McKee I*). The court found SVP's are similarly situated with individuals found not guilty by reason of insanity (NGI's) and mentally disordered offenders (MDO's) for equal protection purposes. The court then remanded the matter to the trial court to hold a hearing to determine whether the People could justify "the differences between the SVP and NGI commitment statutes." (*Id.* at p. 1207.) We suspended further proceedings in this appeal pending the remand in *McKee I* and the finality of an appellate court decision reviewing the hearing to be held on remand.

The San Diego Superior Court found the People carried their burden and found no equal protection violation. Our brethren in Division One affirmed the finding (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1350 [144 Cal.Rptr.3d 308] (*McKee II*), and the Supreme Court denied review. After *McKee II* became final, we asked for and obtained supplemental briefs from the parties on the equal protection issue. We now affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

# I

## PROCEDURAL AND FACTUAL BACKGROUND

### A. *Procedural Background*

Prior to appellant's parole release date, California's Department of Corrections requested the State Department of Mental Health (DMH) to evaluate appellant for purposes of determining whether he qualified as an SVP. Philip Trompetter, Ph.D, and Jon French, Ph.D, each concluded appellant was an SVP and DMH referred the matter to the Orange County District Attorney to consider filing a petition to commit appellant pursuant to the SVPA.

The district attorney filed the petition on October 19, 2000. A declaration attached to the petition averred that appellant (1) was convicted on May 5, 1982, of two counts of orally copulating a child under 14 years of age (Pen. Code, § 288a, subd. (c)), David D., and sentenced to six years in prison and (2) was convicted on June 10, 1988, of 18 counts of committing a lewd act on a child under 14 years of age (Pen. Code, § 288, subd. (a)), including orally copulating Gregory S., and was sentenced to 17 years in state prison. The declaration further stated two independent mental health professionals evaluated appellant and determined he has a diagnosed mental disorder and is likely to engage in acts of sexual violence without appropriate care and custody.

Appellant appeared in court with counsel on November 9, 2000. Eight days later he waived his right to a probable cause hearing. The court set the trial for March 26, 2001. From March 26, 2001, until May 2006 a trial date was set and vacated a number of times, but mostly the matter was continued time and again without setting a trial date. At least 16 of the continuances were at the request of appellant's counsel or stipulated to by counsel. During this same time period, appellant had a number of attorneys, appointed and retained. One of appellant's eventual trial attorneys, Leonard Levine, substituted in as counsel of record on June 27, 2003. His other trial attorney, Michael Aye, appeared later.

The matter was eventually scheduled for trial in November 2005. On November 4, 2005, Deputy District Attorney Andrew Do informed the court an expert on the case had changed his opinion, a "recent development" in the case, and that it was therefore necessary to continue the trial. On December 12, 2005, Do asked the court to vacate the trial date and to set the matter for a January 13, 2006 pretrial. Defense counsel waived time for trial.

The first trial on appellant's case did not begin until June 6, 2006, when the court ruled on a number of preliminary evidentiary issues. In the interim,

appellant made motions for immediate assignment for trial or dismissal of the petition for lack of a timely trial. The motions were denied.[2] Another deputy district attorney, Andrea Burke, tried the matter for the People. On June 21, 2006, the court declared a mistrial when the jury was unable to reach a verdict, having split 11 to one for finding the petition not true. A second trial was scheduled for August 14, 2006.

On July 3, 2006, Burke filed a motion to require appellant to participate in interviews for updated SVP evaluations. (§ 6603, subd. (c)(1).) The deputy district attorney also requested an order requiring appellant to submit to an interview by the district attorney's retained expert, Dr. Arnold. The court granted the requests over appellant's opposition.

On August 14, 2006, the date set for trial, the district attorney's office requested a continuance to further prepare for trial, and filed an application for an order requiring appellant to show cause why the district attorney should not be permitted to access, copy, and review materials appellant mailed to himself and addressed to a location in Orange, California. The district attorney had come into possession of 18 sealed boxes of material appellant mailed to himself from the state hospital, and wanted to search the boxes before going to trial. The boxes were mailed to Donald Galbraith's business. The district attorney alleged the boxes were obtained with Galbraith's consent. Appellant opposed the district attorney's requests. His attorney asserted the boxes were appellant's property, that an order to show cause was not the proper procedure for searching the boxes, and that the district attorney should proceed by way of a search warrant or a subpoena duces tecum. On September 1, 2006, the court held the boxes were properly seized and ordered the district attorney to open the boxes, inspect, copy, and use any materials found in the boxes.

The case was sent out for retrial on December 4, 2007, but appellant filed a Code of Civil Procedure section 170.6 challenge to the assigned judge, and the case continued to trail. On December 11, 2007, appellant filed another motion to dismiss for lack of a timely trial. That motion was denied the next day. The second trial finally began on December 18, 2007, when Judge King started pretrial motions. Deputy District Attorney Amy Pope tried the case on behalf of the People. Jury selection began on January 2, 2008, and another mistrial was declared on February 6, 2008, when the second jury was unable to reach a verdict.

Yet another deputy district attorney, Dan Wagner, was assigned to appellant's matter after the second mistrial. On March 17, 2008, both sides

---

[2] Appellant raised the due process issue of a timely trial on a number of occasions throughout these protracted proceedings. We will set out his arguments and the particulars of the continuances in more detail in part II of this opinion.

answered ready for the third trial. Wagner also moved for an order directing appellant to submit to mental evaluations by his retained experts, Drs. Veronica Thomas and Park Dietz. The court found good cause to reopen discovery and for one mental health evaluation. In May 2008, appellant again made a motion to dismiss and the court denied it. The case was not assigned to a trial court until June 23, 2008, when it was transferred to Judge Donahue's courtroom. Once the case was assigned out for trial, appellant again unsuccessfully moved to dismiss the petition. Jury selection began on June 30, 2008. Appellant's motion to exclude evidence obtained as a result of the search of defendant's sealed boxes was denied.

## B. *Facts from the Third Trial*

The sordid details of appellant's underlying convictions, uncharged molestations, and conduct whereby he groomed young boys to have sex with him, as well as his actions to ingratiate himself to the boys' parents to allow him greater access to his victims, are not important to the issues presented in this appeal. As a result, these facts are not set forth in great detail. The short version is that appellant repeatedly molested a number of boys, including Jerry T., Scott C., Sid S., David D., and Gregory S. In 1982, he pled guilty to two counts of orally copulating a child under the age of 14 (David D.) and in 1988, he pled guilty to 18 counts of lewd acts with a child under the age of 14 (Gregory S.). Appellant's trial strategy was to admit his past, but urge the jury to accept that because of age and ill health he is not likely to reoffend.

Appellant, who was 69 years old at the time of trial, began taking Prozac for depression in 1993, after suffering a heart attack. He stopped taking it in 2000 when he was prescribed Paxil in its place. Appellant was treated for prostate cancer in 2000. In 2004, he had a pacemaker implanted. These health concerns aside, appellant stretches, does crunches and pushups and walks up to 10 to 15 miles a day while at the hospital.

Appellant testified he no longer has "the libido anymore for sex . . . . So it's all dead and gone." He said he has zero sex drive "at the moment." According to appellant, the hospital staff encouraged him to possess hardcore pornography in the hospital. He subscribed to a hardcore pornography magazine in 2003, so he could masturbate to it because he "was changing from children." He said he needed to stop thinking about children while masturbating.

In December 2003, appellant sent a box of his belongings to his brother and sister-in-law. She threw it away because it contained pornography. Between 2003 and 2006, appellant mailed 18 boxes of belongings he could not keep in the hospital to the Galbraith address. The boxes contained more

than 45,000 articles and pictures. Included were articles on intergenerational daycare centers, setting up a babysitting business, going to Disney World, where to buy toys wholesale, and children getting lost at water parks. He said he was interested in the last article because it discussed locator bracelets and he thought he could use a locator if he got a dog.[3] He also had an article about a boy who exposed himself over the Internet.

Appellant clipped pictures for other patients interested in children. He traded them for snacks. Photographs of children were in the 18 boxes. One included a boy lying on a bed in a pair of briefs. Another showed Russell Crowe kissing a boy on the forehead. According to appellant, those photographs were meant for other patients and were mistakenly included in the boxes.

In one of the journals he mailed with the boxes, appellant wrote about his dreams. The December 25, 2003 entry read: "Had vivid dream of what I could only surmise was about Greg when he was very young, I first met him and his mom was even in the dreams." The January 29, 2004 entry read: "Had a weird sleepless night. . . . Had strange dreams of Adrays local parking area and two kids I met who propositioned me and took me to their home. Really weird combination."

Appellant analogized pedophilia to alcoholism. He said he does not feel he is cured of pedophilia, but he believes he no longer meets the legal definition because he does not have an "intense desire for the children." He said that over the last three years or more he has not had any sexual desire because of his heart attack, his inability to have an erection, his awareness of his own mortality, and because radiation treatment has made ejaculation painful.[4]

Appellant believes that as long as he stays away from children, he will not reoffend. He hopes that having an adult with him when he goes to Disneyland will reduce any risk or danger presented by his presence at the park.

Appellant said he will move to New York if released and will live with his brother and sister-in-law, where he will be treated by Dr. Friedmutter.[5] Appellant has never met or spoken with the doctor, but he did receive a letter from Dr. Friedmutter suggesting treatment six days a week. Appellant said he would only go to places approved by the doctor. Appellant added that he does not see any harm in going to public places where children are present because he never molested strangers.

---

[3] In the past appellant took his dog to the park in order to meet boys and bring them home.

[4] In July 2005, a month before appellant's journal ended, he wrote about ejaculating.

[5] Friedmutter is a general practitioner and does not specialize in treating pedophiles or sex offenders.

Dr. Dietz, a forensic psychiatrist, was retained by the district attorney to evaluate appellant. His evaluation relied upon the interview he conducted with appellant, a personality assessment inventory given to appellant, mental health evaluations prepared as far back as 1982, photographs, legal reports, parole reports, letters written by appellant, and appellant's prior testimony. He stated his role was to assess whether appellant would reoffend.

The doctor diagnosed appellant with two mental disorders: pedophilia and Asperger's disorder. Pedophilia requires that over a period of six months, "recurrent, intense sexually arousing fantasies, sexual urges or behaviors involving sexual activity with a pre-pubescent child or children have characterized this patient." The doctor concluded appellant is a pedophile based upon statements appellant made to other evaluators acknowledging his attraction to boys, his placing the responsibility for the behavior on the boys, going out of his way to purchase child pornography from more than one mail-order house while on parole for child molestation, and the fact that appellant photographed two of his victims. Dietz said pedophilia is not curable.

He explained that the behavior of a pedophile is similar to that of a normal individual, except that the object of desire is a child. In other words, a pedophile enjoys conduct ranging from mere touching to more intimate connections, "all of those kinds of behaviors that adults will do with their consenting adult partners," including digital penetration and giving oral sex. As a result, a pedophile who cannot get an erection may still become aroused and interested in a child. As to appellant's claim that he is now asexual, the doctor stated, "I think it's clearly the case that interest diminishes, abilities diminish, these things do change with age. The idea of becoming completely asexual I find somewhat suspicious for someone who had earlier been quite sexual." The doctor said the most telling information about appellant's level of fitness comes from his ability to exercise as much as he does. Appellant is "quite fit and fit beyond most men his age."

The doctor said appellant's Asperger's is disquieting because people with Asperger's tend to view others as objects and to lack empathy. Lack of empathy makes it easier for a pedophile to reoffend. Appellant's clipping pictures of children to trade with other patients tends to show he views the children in the photographs as objects.

Dietz concluded appellant poses a "substantial, serious, well-founded risk to engage in sexually violent predatory criminal behavior as a result of his mental disorder if . . . released into [the] community." He stated a number of reasons for his conclusion.

In 2006 appellant testified, "I know I am a pedophile and I want treatment," but he had not taken advantage of the opportunity to receive treatment

prior to or after his testimony. Cognitive behavior therapy is effective, but requires a willingness on the part of the patient to look at himself or herself and his or her behavior. Dietz said a treated pedophile should realize what he has to do to avoid taking the first step down the path of reoffending and appellant lacks that thought process because he thinks it is enough to plan to stay away from children. A pedophile has to recognize that unplanned things can happen when they come in contact with children.

One method of treatment is the use of selective serotonin reuptake inhibitor antidepressants such as Prozac, which have a side effect of decreasing libido. Two weeks before trial, appellant told Dr. Dietz he stopped taking Paxil because he wanted to feel everything. This is a concern because a side effect of the medications can be a reduction of libido. In 2000, appellant told Dr. French the medication significantly reduced his libido. Dietz said, "It's a significant concern to me that a period of time during which he says he's had decreased sexual interest, desire, urge and function, he's been on a group of medications that can cause that to occur. And now just as he gains confidence at being able to become free, he stops taking the medication that might be causing those effects in him and that he said previously had done so." The doctor said that one possibility for appellant's decision is that he wants to give "free reign to his libido because he knows he's getting out."

Libido and the ability to have an erection are two different things. Both, however, could be affected by the subjects of two of appellant's clippings: an ad for Viagra (for erectile dysfunction) and an ad for testosterone (for libido). Dietz said appellant's physical fitness and the articles he saved evidence a continuing interest in sex.

Also of concern to the doctor was the nudist catalog found in the boxes appellant sent to the Galbraiths. Appellant used similar pornography with boys in the past. Another concern involved the fact that appellant kept an article on the vulnerability of boys without father figures and their being more accessible. Additionally, the doctor found appellant's desire to have a dog constituted a red flag given his past use of a dog as a means of acquiring victims. He analogized it to "the man who cruises for rape victims by prowling at midnight—going out and prowling at midnight. It's a technique that's been familiar in the past for finding a victim."

Contrary to appellant's statement that he is not a risk to reoffend because he has will power and does not want to reoffend, Dietz said appellant oversimplifies the issue to avoiding children and does not have the coping skills necessary when he does see children. Punishment has not deterred appellant in the past and probably will not in the future.

Dietz said appellant's plan for release is missing graduation from an effective sex offender treatment plan that included reeducation and relapse prevention, and a support system with professional supervision and support, including periodic assessments by a specialist. For postrelease treatment to be successful, appellant would need to be motivated to change. "He needs to see that there is a problem and in need of solution for that to be useful."

Dietz stated an additional apprehension is the fact that appellant has expressed the concern that he does not want to die alone and stated a desire to have a female partner, but was worried about satisfying her sexually. However, the drugs that can help him satisfy a woman also put him at risk for engaging in the conduct that results in reoffending. Appellant's desire to not be alone was also a theme in his past relationships with boys. He once stated the problem with boys is that they grow up and move away. Considering appellant's statement that he only expects to live another five years, that could mean a boy growing up and moving away may no longer be viewed by appellant as a problem.

Dr. John Messenger specializes in cardiology and internal medicine. He reviewed appellant's medical records regarding his 2004 pacemaker implant, subsequent electrocardiograms, and other medical records, including 2007 and 2008 reports pertaining to prostate function. He is also aware of appellant's daily exercise regimen of 80 modified pushups and 100 modified situps, and walking three to four hours. He concluded appellant has recovered remarkably well from the bypass surgery and prostate cancer. He said bypass surgery and a pacemaker should not interfere with sex.

*Defense*

Appellant had been assigned to a particular unit at Coalinga State Hospital so he could be monitored due to his heart problems (including a pacemaker), a hernia operation, and Asperger's. He also has hearing problems. Hospital staff that testified on his behalf stated they had not observed him to act inappropriately while at the hospital.

Appellant was described by one psychiatric technician as cooperative and a "pack rat." He said appellant hoarded everything and collected newspapers and magazines. When appellant reached the limit for materials he was permitted to keep in his room, he shipped the materials away from the hospital because he wanted to keep everything.

Dr. Richard Romanoff, a clinical and forensic psychologist and a member of the DMH's panel of doctors appointed to evaluate individuals alleged to be SVP's, conducted six evaluations of appellant since 2002. Romanoff said that

when he first evaluated appellant in 2002, he found appellant qualified as an SVP. His opinion has since changed and he presently does not believe appellant is likely to reoffend, based in part upon appellant's age. His opinion changed in 2005, when data showed the number of sex offenders who reoffend after age 60 is very small. Dr. Theodore Donaldson, a clinical psychologist, also testified appellant poses a very low probability of reoffending.

Appellant's sister-in-law testified appellant could live in her house in New York. She has been married to appellant's brother for 45 years. She will have a zero tolerance policy and would call the police if appellant does anything wrong. She feels very strongly that he will not reoffend because he has matured and has never been "a snatch and grabber." He used his home and toys to entice children and he will not have those things in New York. Neither would he be permitted to have a dog.

## II

## DISCUSSION

### A. *Underground Regulations*

■ "Before a petition for commitment may be filed, the SVPA requires a suspected SVP to undergo two psychological evaluations conducted pursuant to a protocol established by the [DMH]. Only if these evaluations result in a finding that the person, in effect, qualifies as an SVP does the SVPA authorize the filing of a commitment petition. Recently, the protocol developed by the Department and used for many years was declared to be an unlawful 'underground regulation' because it was implemented without compliance with the Administrative Procedure Act . . . ." (*People v. Medina* (2009) 171 Cal.App.4th 805, 810–811 [89 Cal.Rptr.3d 830].) Appellant contends he was denied due process because the initial evaluators used illegal underground regulations in his initial evaluations. We assume the initial evaluators used the underground regulations in 2000, and conclude appellant is not entitled to relief because he has failed to demonstrate prejudice arising from the use.

■ When a criminal defendant claims a procedural irregularity occurred prior to a determination of probable cause, the defendant must demonstrate prejudice to prevail on the issue in a postconviction setting unless the claimed error denied the court jurisdiction "in the fundamental sense." (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) The same is true in SVP proceedings when it is claimed that an underground regulation was used in the prisoner's initial DMH evaluation. (*People v. Medina, supra*, 171 Cal.App.4th at pp. 818–819.)

A lack of fundamental jurisdiction " 'means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.]" (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660 [16 Cal.Rptr.3d 76, 93 P.3d 1020].) The failure to use properly enacted regulations in the initial evaluation of a suspected SVP does not result in a lack of fundamental jurisdiction, depriving the court of jurisdiction over the subject matter or appellant. (*In re Ronje* (2009) 179 Cal.App.4th 509, 518 [101 Cal.Rptr.3d 689]; *People v. Medina, supra,* 171 Cal.App.4th at pp. 815–817.)

Appellant was provided a full and fair trial on the petition. Neither of the initial evaluators testified. Appellant presented the testimony of his own experts who testified he does not qualify as an SVP. After hearing all the evidence, the jury concluded beyond a reasonable doubt appellant qualified for commitment as an SVP. Appellant does not contend the evidence was insufficient to support that finding. Accordingly, we conclude appellant has failed to show he was prejudiced by the initial evaluators' use of unlawful underground regulations.

In *In re Ronje, supra,* 179 Cal.App.4th 509, underground regulations were used by evaluators of an alleged SVP. Prior to his trial, Ronje filed a petition for a writ of habeas corpus in this court seeking dismissal of the SVP petition or "new evaluations based on a valid assessment protocol." (*Id.* at p. 513.) Relying upon *People v. Pompa-Ortiz, supra,* 27 Cal.3d 519, 529, we concluded Ronje was not required to prove prejudice to obtain relief because he sought relief pretrial. (*In re Ronje, supra,* 179 Cal.App.4th at p. 513.) As to the proper remedy, we stated dismissal was inappropriate because use of the underground regulations did not deny the trial court fundamental jurisdiction. We therefore directed the superior court to order new evaluations using the valid assessment protocols. (*Id.* at pp. 513–514.)

We reject appellant's claim that he is entitled to the same relief without a showing of prejudice because he raised the issue prior to the court ordering his commitment as an SVP. The question is not whether he raised the issue before entry of a final judgment. The question is whether he raised it *prior to trial,* when a showing of prejudice is not a prerequisite to relief. (*In re Ronje, supra,* 179 Cal.App.4th at p. 513.) As the issue was not raised until after his trial, appellant bears the burden of demonstrating prejudice. He has failed to carry that burden.

## B. *Ineffective Assistance of Counsel*

 Appellant blames his trial attorneys for not having brought the issue of the underground regulations to the trial court's attention before trial. To

prevail on a claim of ineffective assistance of counsel, appellant must meet the two-pronged test of *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]. "To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner. [Citations.]" (*In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222], citing *Strickland v. Washington, supra,* 466 U.S. at p. 687.)

The ineffective assistance claim need not detain us long. Appellant notes in his opening brief the Office of Administrative Law determination that the evaluation regulation was invalid "was not published until after [his] trial." As the court noted in *People v. Medina, supra,* 171 Cal.App.4th 805, "The apparent failure, until very recently, of any attorney to question the validity of the protocol in the 13-year history of the SVPA appears to refute the claim that [appellant's] representation fell below the standard of reasonableness . . . ." (*Id.* at p. 819.) Additionally, given the fact appellant received a full and fair trial and he has not demonstrated that had proper regulations been used there is a reasonable probability a different result would have occurred, appellant has not demonstrated prejudice, the second showing necessary to obtain relief on this claim. (*Id.* at pp. 819–820.) Appellant has failed to make the requisite showing on either prong of the *Strickland* test. As we stated above, the evaluators who used the underground regulations did not testify at trial. The jury, however, accepted the testimony of another expert who, without using the underground regulations, concluded appellant qualified as an SVP.

C. *Fourth Amendment Exclusionary Rule*

Appellant contends the trial court erred in permitting the district attorney to open the sealed boxes he mailed addressed to himself and which remained unopened while they were held for him by his friend Galbraith. He argues the evidence acquired from within the boxes was obtained in violation of his Fourth Amendment rights. The Attorney General argues appellant did not have a legitimate expectation of privacy in the boxes, the Galbraiths consented to the search of the boxes, and the exclusionary rule does not apply in a civil proceeding such as an SVP hearing.

Prior to opening the sealed boxes, the district attorney filed an order to show cause. The purported purpose was to require appellant to show cause why the district attorney should not open and search the sealed boxes. The deputy district attorney submitted the declaration of her investigator and

raised the issue of whether appellant had a reasonable expectation of privacy in the boxes. Appellant filed a counter declaration from Mrs. Galbraith describing how possession was transferred from the Galbraiths to the district attorney's office.

Before considering the array of Fourth Amendment issues presented by the facts, we make an initial inquiry: Does the exclusionary rule apply in an SVP proceeding? If it does not, there is no need to determine whether appellant had a reasonable expectation of privacy in the boxes; whether the purported consent to take the boxes was valid; whether that consent included a search of the sealed boxes; if there was no consent to open the boxes, whether the court's order permitting the search was supported by probable cause; and, if probable cause was not demonstrated, whether the search may be upheld under the good faith exception given law enforcement's reliance upon the court's order to search the boxes.

The well-known exclusionary rule was first announced in *Weeks v. United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341], and held to apply in state criminal prosecutions in *Mapp v. Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684]. The United States Supreme Court has not addressed whether the Fourth Amendment exclusionary rule would apply in a civil proceeding such as those prescribed by our SVPA. On the one hand, it has held the exclusionary rule applies in civil forfeiture proceedings because such proceedings are quasi-criminal in nature and designed "to penalize for the commission of an offense against the law." (*One 1958 Plymouth Sedan v. Pennsylvania* (1965) 380 U.S. 693, 700 [14 L.Ed.2d 170, 85 S.Ct. 1246].) On the other hand, the court has held the exclusionary rule does not apply in parole revocation cases (*Pennsylvania Bd. of Probation and Parole v. Scott* (1998) 524 U.S. 357 [141 L.Ed.2d 344, 118 S.Ct. 2014]), in suit for refund of taxes from the Internal Revenue Service (*United States v. Janis* (1976) 428 U.S. 433 [49 L.Ed.2d 1046, 96 S.Ct. 3021]), or civil deportation proceedings. (*INS v. Lopez-Mendoza* (1984) 468 U.S. 1032 [82 L.Ed.2d 778, 104 S.Ct. 3479] (*Lopez-Mendoza*).) And the California Supreme Court has held the exclusionary rule does not apply in civil commitment proceedings under the Lanterman-Petris-Short Act (§ 5000 et seq.). (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005 [36 Cal.Rptr.2d 40, 884 P.2d 988] (*Susan T.*).) Review of these cases leads us to conclude the rule does not apply in SVP cases.

In *Pennsylvania Bd. of Probation and Parole v. Scott, supra,* 524 U.S. 357, Scott had been sentenced to prison for a third degree murder and was subsequently paroled. (*Id.* at pp. 359–360.) Approximately five months later, parole officers obtained a warrant for Scott's arrest and arrested him for a number of violations of the terms of his parole. (*Id.* at p. 360.) After obtaining a key from Scott, officers went to the residence he shared with his

mother and searched without consent from Scott or his mother. They found a bow, arrows, and a number of firearms. (*Ibid.*) Scott's objection to the introduction of this evidence at his parole violation hearing was overruled. The parole board found Scott in violation and recommitted him to prison for 36 months. (*Id.* at pp. 360–361.)

The Supreme Court granted certiorari to determine whether the exclusionary rule applies in parole revocation hearings. (*Pennsylvania Bd. of Probation and Parole v. Scott, supra,* 524 U.S. at p. 362.) The court noted it had repeatedly emphasized that the Fourth Amendment is not violated by the courts' use of evidence obtained in violation of that amendment. (524 U.S. at p. 362.) The exclusionary rule is a judicially created remedy the purpose of which is to deter future unlawful searches. As a result, it only applies " 'where its remedial objectives are thought most efficaciously served,' [citations]." (*Id.* at p. 363.) For the rule to apply, its deterrent effect must outweigh its " 'substantial social costs.' [Citation.]" (*Ibid.*) The high court stated it has refused to apply the exclusionary rule in grand jury proceedings which often initiate criminal proceedings. (*Ibid.*)

The court declined to extend the exclusionary rule to parole revocation proceedings because "[a]pplication of the exclusionary rule would both hinder the functioning of state parole systems and alter the traditionally flexible, administrative nature of parole revocation proceedings. The rule would provide only minimal deterrence benefits in this context, because application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches." (*Pennsylvania Bd. of Probation and Parole v. Scott, supra,* 524 U.S. at p. 364.) The same is true in SVP proceedings. Exclusion in a criminal case is a sufficient deterrent for law enforcement authorities attempting to discover unrevealed sexual offenses to charge a person alleged to be an SVP.

*Lopez-Mendoza, supra,* 468 U.S. 1032, involved two individuals purportedly arrested unlawfully by Immigration and Naturalization Service (INS) agents. Evidence obtained as a result of the arrests was used in the subsequent deportation proceedings. The intermediate appellate court found Sandoval-Sanchez's detention was unlawful, that his statements were a fruit of the unlawful detention, and the statements should have been suppressed. (*Id.* at p. 1038.)

The Supreme Court characterized deportation proceedings as "a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry" (*Lopez-Mendoza, supra,* 468 U.S. at p. 1038) and concluded the exclusionary rule did not apply in such proceedings (*id.* at p. 1050). The court reached its conclusion by weighing the costs of the exclusionary rule in

deportation matters against the sole purpose of the exclusionary rule: deterrence of unlawful police conduct. (*Id.* at pp. 1045–1050.)

The court stated it had observed in *United States v. Janis, supra*, 428 U.S. 433, a federal civil tax assessment proceeding, that evidence obtained by state officials in violation of the Fourth Amendment would not be admissible in any state or federal criminal prosecution. (*Lopez-Mendoza, supra*, 468 U.S. at p. 1042.) So too, any evidence obtained by the INS agents would be excluded from any state or federal prosecution. (*Ibid.*) Thus, there was a penalty in place to act as a deterrent to unlawful police conduct. The same is true here.

If the district attorney's office had found evidence of a previously undiscovered sex crime, as appellant had argued was the goal of the search, that evidence would be excluded in any resulting criminal prosecution if the discovery was the result of a Fourth Amendment violation. That penalty (see *United States v. Ceccolini* (1978) 435 U.S. 268, 279 [55 L.Ed.2d 268, 98 S.Ct. 1054]) is a sufficient deterrent. That there is a pressing need for an additional deterrence in SVP cases has not been demonstrated. Given the fact a person alleged to be an SVP will be in a custodial setting (prison before the petition is filed and a state hospital after) with a concomitant diminished expectation of privacy, we do not foresee such a need arising.

In *Susan T., supra*, 8 Cal.4th 1005, the California Supreme Court used the same cost-benefit (deterrent effect versus social cost) analysis in concluding the exclusionary rule does not apply in civil involuntary commitment proceedings under the Lanterman-Petris-Short Act. There, Susan T.'s physician wrote to DMH expressing grave concern about her physical and mental well-being. (*Id.* at p. 1009.) A crisis worker contacted Susan T. at her home and, confirming the doctor's concerns, placed Susan T. in a psychiatric facility. (*Id.* at p. 1010.) The Fourth Amendment violation in *Susan T.* occurred when a crisis worker returned to Susan T.'s home and entered without a warrant or exigent circumstances to take photographs of the interior of the residence as evidence. (8 Cal.4th at pp. 1010, 1014.)

The court acknowledged it has applied the exclusionary rule in narcotics addict commitment proceedings, which it stated are roughly analogous to civil commitment proceedings, but the reason for doing so was that the aims and objectives of the two proceedings are quite different. (*Susan T., supra*, 8 Cal.4th at p. 1017.) Narcotics addict commitments possess a " 'close identity to the aims and objectives of criminal law enforcement.' [Citation.]" (*Id.* at p. 1016.) Indeed, "narcotics addict commitment is essentially in lieu of criminal prosecution for narcotics possession . . . ." (*Id.* at p. 1017.) A conservatorship proceeding, however, " 'is not initiated in response, or necessarily related, to any criminal acts . . . . The sole state interest, legislatively

expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings.' [Citations.]" (*Id.* at p. 1015.)

■ SVPA proceedings are more analogous to conservatorship proceedings than criminal proceedings. In initial SVPA proceedings, the petitioner's burden is to prove the alleged SVP has the requisite prior conviction(s) for a designated sexually violent offense, and has been diagnosed with a mental disorder that makes it likely he or she will engage in sexually violent behavior. (§ 6600, subd. (a)(1).)

SVPA proceedings are generally instituted years after the alleged SVP has been convicted. Unlike narcotics commitments, they are not instituted in lieu of criminal proceedings. Indeed, if given a choice between prosecution of an individual who has at least one serious felony prior conviction (Pen. Code, § 667, subd. (a)(1)) and at least one "strike" prior conviction (Pen. Code, § 667, subds. (b)–(i)), a prosecutor would presumably opt for prosecution over an SVP civil commitment. If convicted, the defendant would face years and years in prison and, if he or she thereafter lives to complete the term imposed, there would still be the prospect of an SVP commitment at the end of the imprisonment.

■ Like conservatorship proceedings, the SVPA does not seek to punish and does not impose punishment. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171 [81 Cal.Rptr.2d 492, 969 P.2d 584].) Institution of proceedings under the SVPA is not connected to and does not require a pending criminal action.

Proof of a prior conviction for a sexually violent offense may be shown by documentary evidence, i.e., court and prison records. (§ 6600, subd. (a)(3).) Proof of the predatory nature of the offense is often established by live testimony from those who were victims of or witnesses to the prior incident(s) from years before. For example, in the present case, the appellant's victims testified to incidents from as far back as 1969. We perceive no incentive here for the district attorney or any other law enforcement agency to engage in acts violating the Fourth Amendment as a means of acquiring such evidence years or even decades after the facts are already known to law enforcement. Additionally, the parties have not cited, and we have not found, any SVP case where an alleged SVP claims his Fourth Amendment rights were violated during the pendency of the SVPA proceedings. The lack of any

other case lends weight to the proposition that, like conservatorship proceedings, SVP cases do not present a compelling need for an additional deterrent to unlawful searches or seizures over and above exclusion in a criminal prosecution.

■ As already noted, law enforcement officers looking to uncover undetected crimes of an alleged SVP know that should the evidence be obtained in violation of the Fourth Amendment, the evidence and its fruits will be excluded in a criminal trial. That deterrent being present, we conclude the social cost of excluding the same evidence in an SVPA proceeding—exclusion of reliable evidence and exposure of the public to the acts of individuals who suffer from a mental disability, the existence of which adversely affects the person's volitional ability and predisposes the person to committing sexual acts against others, making him or her a danger to the health and safety of others—is not outweighed by the minimal beneficial effect that would result from excluding evidence in an SVPA proceeding. (See *Susan T., supra*, 8 Cal.4th at p. 1017, fn. 9 [listing civil settings where benefit of exclusion outweighed by cost of exclusion].) Accordingly, the superior court did not err in failing to exclude evidence claimed to have been obtained in violation of appellant's Fourth Amendment rights.[6]

■ In *Susan T.*, the court stated that "[w]hether the exclusionary rule bars the admission of evidence in a civil proceeding depends, first, on the existence of a search or seizure that violates the protections of the Fourth Amendment of the federal Constitution." (*Susan T., supra*, 8 Cal.4th at p. 1012.) We do not take this statement to mean a court must *first* decide whether there has been a violation of the Fourth Amendment and only then decide whether the exclusionary rule applies in a civil proceeding. Such an interpretation would require a court conducting a conservatorship hearing to *first* determine whether there had been a Fourth Amendment violation before deciding, in conformance with *Susan T.*, that the exclusionary rule does not apply in conservatorship proceedings. Having concluded the exclusionary rule is not required in SVPA proceedings, we do not engage in what could only be a useless exercise in determining *whether* the evidence that cannot be excluded, assuming a Fourth Amendment violation, was in fact obtained in violation of the Fourth Amendment.

---

[6] We note appellant does not claim the manner in which the evidence was obtained was "so egregious as to offend the ' "traditions and [collective] conscience of our people" ' [citation], or to 'shock the conscience' [citation]," so as to "implicate due process concerns. [Citation.]" (*Susan T., supra*, 8 Cal.4th at p. 1020.)

## D. Discovery Issues

Appellant claims the court violated his right to due process and abused its discretion "by repeatedly granting the prosecution's request to reopen discovery without a showing of good cause and by granting prosecution experts access to appellant's private medical and mental health records and ordering appellant to submit to unnecessary and unauthorized mental examinations." He argues the trial court. erred in reopening discovery after the first and second mistrials in this matter and in compelling appellant to submit to mental examinations by Drs. Arnold, Maram, Romanoff, and Dietz.

We review discovery claims for an abuse of discretion, " 'because management of discovery lies within the sound discretion of the trial court. [Citation.] Thus, where there is a basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court.' [Citations.]" (*Lee v. Superior Court* (2009) 177 Cal.App.4th 1108, 1124–1125 [99 Cal.Rptr.3d 712].) If an abuse of discretion is found, reversal after trial is ordinarily permitted only if the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *County of Nevada v. Kinicki* (1980) 106 Cal.App.3d 357, 363 [165 Cal.Rptr. 57].)

Appellant argues the court erred in granting the district attorney's motion to compel appellant to submit to updated mental evaluations. That motion alleged appellant had previously refused to be interviewed by two of the district attorney's experts, but had agreed to interviews with his own experts. Appellant argued there was no need for an interview by Dr. Maram because the doctor sat through appellant's testimony at trial and was permitted to assist the deputy district attorney in questioning him. He also asserted section 6603, subdivision (c) is the sole authority for updated evaluations, that section did not authorize the evaluations because the doctors were not the original evaluators, and the statute does not authorize evaluation by an expert *retained* by the prosecution. At oral argument, appellate counsel conceded an expert retained by the district attorney may review otherwise confidential records and interview an alleged SVP if good cause for the evaluation exists.

Drs. French and Trompetter were the original evaluators in 2000. Accordinging to appellant, these doctors were replaced in 2002, by Drs. Maram and Romanoff. As early as 2003, Drs. Maram and Romanoff conducted "updated evaluations" without objection. They both performed updated evaluations again in 2005, without objection. In 2006, appellant's counsel conceded the court had properly found appellant had waived the objection that Maram and Romanoff were not original evaluators. Appellant's objection to the replacement of the original evaluators with Drs. Maram and Romanoff was untimely when ultimately made years later. (*People v. Demetrulias* (2006) 39 Cal.4th 1,

22 [45 Cal.Rptr.3d 407, 137 P.3d 229].) Once Maram and Romanoff replaced the original evaluators, the district attorney was entitled to have section 6603, subdivision (c)(1) updated evaluations by those doctors when their prior evaluations became stale. (*Albertson v. Superior Court* (2001) 25 Cal.4th 796, 803 [107 Cal.Rptr.2d 381, 23 P.3d 611].) However, even if updated evaluations by Maram and Romanoff should not have been ordered, appellant has failed to demonstrate any prejudice. Maram did not testify at the third trial and Romanoff testified as a defense witness. Along the same line, any alleged error in the court granting Dr. Arnold access to appellant's records and an interview with appellant was harmless because Dr. Arnold did not testify at appellant's third trial. That leaves Dr. Dietz.

■ "[T]he Civil Discovery Act applies to SVPA proceedings . . . ." (*People v. Angulo* (2005) 129 Cal.App.4th 1349, 1368 [30 Cal.Rptr.3d 189].) The act is "applied in each SVPA proceeding on a case-by-case basis." (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 994 [114 Cal.Rptr.2d 760].) The discovery rules are "liberally construed in favor of disclosure and the trial court is vested with wide discretion to grant or deny discovery. [Citation.]" (*Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 180 [85 Cal.Rptr.3d 321].)

■ Subject to restrictions "set forth in Chapter 5 (commencing with Section 2019.010)," any party may obtain a mental or physical examination of another party to the action. (Code Civ. Proc., § 2032.020, subd. (a).) This section does not require a party to put his or her mental state into controversy. It merely requires the mental condition "of that party or other person is in controversy in the action." (*Ibid.*) Code of Civil Procedure section 2019.010, subdivision (d) also authorizes discovery via mental examinations. There is no restriction in chapter 5 of the Code of Civil Procedure that would appear to prohibit the requested discovery in this matter.

Neither is there anything in section 6603, subdivision (c)(1) to support appellant's argument that the court cannot order an alleged SVP to submit to a mental examination by an expert retained by the district attorney. That section speaks to the issue of examinations by initial evaluators and their replacements. While it provides the exclusive procedure for updated or replacement evaluations of initial evaluators and requires the DMH to perform the updates requested by the district attorney, the section does not address examination by other experts.

Subdivision (c)(1) of section 6603 was enacted as a response to the Court of Appeal's decision in *Sporich v. Superior Court* (2000) 77 Cal.App.4th 422 [91 Cal.Rptr.2d 752], wherein the court concluded there was no statutory authority for the district attorney to obtain updated mental evaluations.

(*Albertson v. Superior Court, supra*, 25 Cal.4th at pp. 805–806.) The Legislature created that statutory authority, obviating the need for the Supreme Court to determine whether the Court of Appeal had reached the proper conclusion. (*Id.* at p. 804.)[7]

 The trial court found good cause for Dr. Dietz's examination and we cannot say the court abused its discretion as a matter of law. Although repetitive examinations may become unduly burdensome in any case, they "are permissible if there is a showing of good cause." (*Kees v. Medical Board* (1992) 7 Cal.App.4th 1801, 1814 [10 Cal.Rptr.2d 112].) An SVPA case requires a *current* mental condition, and when resolution of the case spans several years, multiple examinations are likely to be the rule rather than the exception.

 Appellant argues discovery had closed and the request for an examination by Dr. Dietz was untimely, because the district attorney's motion was filed on the trial date. Code of Civil Procedure section 2024.020, provides a date by which discovery closes. "Except as otherwise provided in this chapter, any party shall be entitled as a matter of right to complete discovery proceedings on or before the 30th day, and to have motions concerning discovery heard on or before the 15th day, before the date initially set for the trial of the action." (Code Civ. Proc., § 2024.020, subd. (a).) Section 2024.050 of the Code of Civil Procedure authorizes the court to permit a party to reopen discovery. (Code Civ. Proc., § 2024.050, subd. (a).) In exercising its discretion whether to permit further discovery, the court is to take into consideration a number of factors, including "[t]he necessity and the reasons for the discovery" (Code Civ. Proc., § 2024.050, subd. (b)(1)), the "diligence or lack of diligence" on the party requesting the discovery and the reasons the discovery was not requested earlier (Code Civ. Proc., § 2024.050, subd. (b)(2)), the likelihood granting the request would result in a delay of the trial (Code Civ. Proc., § 2024.050, subd. (b)(3)), and the length of delay between the prior and present trial settings (Code Civ. Proc., § 2024.050, subd. (b)(4)).

Here, the second mistrial was declared on February 6, 2008. Just over two weeks later, on February 22, 2008, the court set March 17, 2008, for retrial at appellant's request, denying the district attorney's request for a date in June 2008. Thus, the trial was set within 30 days. Although the request for the evaluation was not made until the trial date, there was little chance granting the request would cause a delay in the trial. The earliest appellant's matter was sent out for trial in either of his two prior trials was 20 days after the

---

[7] *Albertson* did not involve an order directing the alleged SVP to submit to a mental examination by a psychologist or psychiatrist outside the DMH and retained by the district attorney.

parties answered ready. The delay before the parties were sent out on the second trial was even longer. The evaluation could easily be completed without delaying the trial. Lastly, although the district attorney answered ready for trial on March 17, 2008, the last evaluation performed by an expert retained by the district attorney was nine months old and would be a year old, and presumably stale (*Albertson v. Superior Court, supra*, 25 Cal.4th at p. 802), if the trial trailed for a significant period of time, as it eventually did. These facts support the trial court's decision to order the evaluation, the close of discovery notwithstanding.

## E. *Due Process*

Appellant contends the petition should be dismissed because he was denied due process by the court's failure to provide him with timely trials on the SVP petition. While the superior court consistently and repeatedly failed to appreciate the fact that appellant's matter was not just another civil case on its calendar and that appellant was entitled to a trial in a timely fashion, the lack of a statutory time limit notwithstanding, we conclude the various continuances did not deny appellant due process. Although appellant remained in custody for more than seven years from the filing of the SVP petition (Oct. 19, 2000), through two mistrials, and finally a third trial where the jury found beyond a reasonable doubt that he was an SVP (July 31, 2008), the vast majority of the delays were at appellant's request or with his consent. The delays attributable to the court or the district attorney did not amount to a denial of due process.

### 1. *Due Process and the* Litmon *Cases*

SVP proceedings are creatures of statute (§ 6600 et seq.) first enacted in 1995. (Stats. 1995, ch. 763, § 3, p. 5922.) The development of an alleged SVP's due process right to a timely trial is necessarily a more recent development that arose because the SVPA does not delineate a timeframe in which an alleged SVP's trial must be conducted once the court has determined the petition is supported by probable cause.[8]

██ "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. [Citations.]" (*Addington v. Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804].) The "most elemental of liberty interests" protected by the due process clause is "the interest in being free from physical detention by one's own government. [Citations.]" (*Hamdi v. Rumsfeld* (2004) 542 U.S. 507, 529

---

[8] A person alleged to be an SVP is entitled to a probable cause hearing within 10 days of a judge's facial review of the SVP petition (§ 6601.5), but no time guideline is set for trials.

[159 L.Ed.2d 578, 124 S.Ct. 2633] (plur. opn of O'Connor, J.).) "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. [Citation.]" (*Foucha v. Louisiana* (1992) 504 U.S. 71, 80 [118 L.Ed.2d 437, 112 S.Ct. 1780].)

In *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170 [11 Cal.Rptr.3d 573], Orozco had been committed as an SVP for a two-year term and, prior to the expiration of the term, the People filed a petition to recommit Orozco for an additional two years.[9] The initial term of commitment was set to expire on May 13, 2001. (*Orozco v. Superior Court, supra*, 117 Cal.App.4th at pp. 173–174.) The recommitment petition had still not been tried by March 18, 2003. On that day, approximately two months before the term sought by the recommitment petition would have expired had Orozco been tried and found to again qualify as an SVP, the People filed a second recommitment petition. This petition was for the two-year period from May 13, 2003, through May 13, 2005. (*Id.* at p. 175.) The matter eventually was continued into June 2003, after the two-year term on the first recommitment petition would have expired. Orozco filed a motion to dismiss both recommitment petitions, arguing that as the trial court had failed to hold a trial on the first recommitment petition during the period it sought to confine him the court lost jurisdiction over both petitions. (*Ibid.*) The primary issue in the subsequent writ proceedings was "whether there is a jurisdictional requirement under the [SVPA] that a recommitment order be obtained before the expiration of the previous term." (*Id.* at p. 173.)

The appellate court concluded the trial court did not lose jurisdiction by failing to conduct the trial on a recommitment petition during that period of time for which recommitment is sought. (*Orozco v. Superior Court, supra*, 117 Cal.App.4th at p. 180.) Although the appellate court denied Orozco the dismissal he requested, the court directed "the issuance of a peremptory writ of mandate directing [the trial] court to set the first recommitment petition for trial forthwith . . . ." (*Id.* at p. 173.)

In *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156 [21 Cal.Rptr.3d 21] (*Litmon I*), Litmon had been committed as an SVP on May 2, 2000, for a two-year term. (*Id.* at p. 1163.) Before his two-year commitment expired, the

---

[9] The SVPA originally provided for a two-year commitment for a person found to qualify as an SVP. (Former § 6604, as amended by Stats. 2000, ch. 420, § 3, p. 3139.) While former section 6604 was in effect, an SVP commitment could be extended every two years for an additional two-year period. However, each extension required the filing of a new petition and a determination that the person was presently an SVP. (Stats. 2000, ch. 420, § 3, p. 3139; see Historical and Statutory Notes, 73E West's Ann. Welf. & Inst. Code (2010 ed.) foll. § 6604, pp. 149–150.) In 2006, the SVPA was amended and the two-year commitment term was replaced with an indeterminate term of commitment. (§ 6604.)

People filed a petition to recommit him for an additional two-year term from May 2, 2002, to May 2, 2004. (*Ibid.*) As the two-year term sought by the recommitment petition was about to expire, and Litmon having not yet had a trial on that petition, the People filed a second recommitment petition seeking to extend Litmon's commitment for a second two-year period from May 2, 2004, to May 2, 2006. (*Ibid.*) After filing the second recommitment petition, the People successfully moved to consolidate the two petitions over Litmon's objection, resulting in a further delay of the trial on the issues raised in the first recommitment petition. As a result of consolidation, trial on the issue of whether Litmon qualified as an SVP and should be committed for the two-year term from May 2, 2002, to May 2, 2004, was not scheduled until *after* May 2, 2004. (*Id.* at p. 1164.)

Although the appellate court found the trial court had the power to order the petitions consolidated, it found that continuing petitioner's trial date on the first petition over his objection—to accommodate consolidation—was error. (*Litmon I, supra*, 123 Cal.App.4th at p. 1161.) The court noted that because the SVPA did not set a limit upon the time within which a trial must be held, "some SVP trials languish at the end of the long queue of civil cases awaiting trial in our already overworked trial courts." (123 Cal.App.4th at p. 1171.) The court concluded that notwithstanding the lack of a statutory time limit for trial in the SVPA, "there must be some limit to the length of time trial on an SVP petition can be delayed." (123 Cal.App.4th at p. 1171.) "We agree with the *Orozco* court that '[s]urely the Legislature did not contemplate the lengthy delay which occurred here. The trial court should . . . ensure the matter proceeds to trial within a reasonable time following the probable cause hearing.' [Citation.]" (*Id.* at pp. 1171–1172.)

The *Litmon I* court urged trial courts "to utilize the delay-minimizing guidelines and tools that already exist," such as granting an SVP case preference pursuant to Code of Civil Procedure section 36, subdivision (e), and using the court's inherent power to control proceedings. (*Litmon I, supra*, 123 Cal.App.4th at p. 1172.) "[W]e believe every effort consistent with existing statutory law must be made to bring SVP petitions to trial expeditiously and certainly well before the expiration of the very two-year commitment period at issue in the trial." (*Ibid.*) The *Litmon I* court remanded the matter to the trial court with directions to immediately schedule trial on the first petition for recommitment, noting it was the only remedy available to Litmon. (*Id.* at p. 1177.)

After remand, trial on Litmon's first recommitment petition (covering the two-year term from May 2, 2002, to May 4, 2004) concluded on September 7, 2005, when the jury found him to be an SVP. The court recommitted Litmon for the two-year period of May 2, 2002, to May 2, 2004. (*People v.*

*Litmon* (2008) 162 Cal.App.4th 383, 390 [76 Cal.Rptr.3d 122] (*Litmon II*).) Litmon, who had represented himself at trial, requested appointment of counsel. (*Id.* at p. 390.) The district attorney informed the court the People were ready to proceed on the second recommitment petition covering the two-year period of May 2, 2004, to May 2, 2006. (*Id.* at pp. 390–391.) Litmon agreed to waive time to permit appointment of counsel and the court eventually set the second recommitment trial in February 2006. Within a week of the court setting the trial date, the People filed a third recommitment petition, this one covering the two-year term from May 2, 2006, to May 2, 2008. (*Id.* at p. 391.)

After the court found the third recommitment petition was supported by probable cause, the court granted the People's request to consolidate the second and third recommitment petitions. (*Litmon II, supra*, 162 Cal.App.4th at p. 391.) Trial on the consolidated petitions began on February 21, 2006, and the court declared a mistrial on March 10, 2006, when the jury was unable to reach a verdict. (*Ibid.*)

On April 7, 2006, the court set the consolidated petitions for retrial on January 8, 2007, with in limine motions to begin on January 4, 2007. The court determined the date set for in limine motions was the first day both attorneys were available. The deputy district attorney had another SVP trial scheduled in April and any delay in that case would require it to be continued for up to a year. (*Litmon II, supra*, 162 Cal.App.4th at pp. 391–392.) The court also observed that the witnesses in Litmon's matter were engaged throughout the state on other SVP matters and set the dates " '[i]n order to lock down the witnesses and have [a] date certain the peculiar scheduling of these cases requires that not only this case be taken into consideration but all the other SVPA cases in this county.' " (*Litmon II, supra*, 162 Cal.App.4th at p. 391.) Litmon's attorney told the court she was ready to try the case " 'right now' " and that Litmon did not want any further delay. (*Id.* at p. 392.) She urged the court to call the case for trial in one week, and cited *Litmon I* and Code of Civil Procedure section 36, subdivision (e) as authority for the priority setting. (*Litmon II, supra*, 162 Cal.App.4th at p. 392.)

On August 24, 2006, Litmon filed a motion to dismiss. He argued that continuing the retrial from April 2006 until January 2007 violated due process and constituted excessive pretrial delay. (*Litmon II, supra*, 162 Cal.App.4th at p. 392.) The court denied the motion because it found there was no speedy trial right in SVP cases. (*Id.* at p. 393.)

After the court denied Litmon's motion to dismiss, the Legislature amended the SVPA to provide for indeterminate commitments (Stats. 2006, ch. 337, §§ 55, 56, 62, pp. 2665, 2666, 2668) in place of the previous

two-year commitments as did the electorate when it passed Proposition 83 that same year. (Prop. 83, §§ 27, 28.) Days before Litmon's January 2007 retrial date, the district attorney moved to continue the trial into March 2007 because in December 2006 when he finally subpoenaed the experts, he discovered three of the four had already been subpoenaed on cases with higher priorities. The court overruled Litmon's objection, denied his renewed motion to dismiss, and continued the retrial to March 19, 2007. Litmon was never retried on the consolidated petitions because on March 15, 2007, the court granted the People's motion to retroactively impose an indeterminate commitment on Litmon's original May 2, 2000 SVP commitment. (*Litmon II, supra*, 162 Cal.App.4th at p. 394.)

On appeal, Litmon contended his Fourteenth Amendment right to due process was violated by the "excessive delay in bringing [the] matter to trial following the declaration of mistrial on March 10, 2006." (*Litmon II, supra*, 162 Cal.App.4th at pp. 394–395.) The Court of Appeal agreed. (*Id.* at p. 406.) It first found a due process right to a timely trial in SVP proceedings and then found the delay in Litmon's case resulted in a denial of due process. (*Id.* at pp. 401, 404–405.)

"[A] person has a right to liberty that a government may not abridge without due process." (*Litmon II, supra*, 162 Cal.App.4th at p. 406.) Due process protects "a liberty interest in avoiding involuntary commitment." (*Jones v. United States* (1983) 463 U.S. 354, 384 [77 L.Ed.2d 694, 103 S.Ct. 3043].) " '[F]or the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," [citation], and in consequence "requires due process protection." [Citations.]' [Citation.]" (*Litmon II, supra*, 162 Cal.App.4th at p. 400.) Because of the "significant deprivation of liberty" involved in civil commitments, "a defendant in an SVP proceeding is entitled to due process protections. [Citation.]" (*People v. Otto* (2001) 26 Cal.4th 200, 209 [109 Cal.Rptr.2d 327, 26 P.3d 1061].) As a component of procedural due process in an SVP case, the person alleged to be an SVP is entitled to a trial within a " 'meaningful time.' " (*Litmon II, supra*, 162 Cal.App.4th at p. 399.) "[L]engthy postdeprivation pretrial delay in an SVP proceeding is oppressive." (*Id.* at p. 406.)

The *Litmon II* court discerned two balancing tests announced by the United States Supreme Court and applied each test to the facts presented, noting the high court had not yet decided which test "or some amalgam" will be applied "in evaluating a procedural due process claim of excessive pretrial delay in the context of involuntary civil commitments." (*Litmon II, supra*, 162 Cal.App.4th at p. 399.) The first test was based upon the high court's decision in *Mathews v. Eldridge* (1976) 424 U.S. 319 [47 L.Ed.2d 18, 96 S.Ct. 893] (*Mathews*).

 The question presented in *Mathews* was whether due process required a hearing prior to termination of a recipient's Social Security benefits. (*Mathews, supra,* 424 U.S at p. 323.) The court reiterated that "[t]he 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' [Citation.]" (*Id.* at p. 333.) It also acknowledged that due process " 'is flexible and calls for such procedural protections as the particular situation demands.' [Citation.]" (*Id.* at p. 334.) This flexibility connected to a given situation "requires analysis of the governmental and private interests" affected in a given case. (*Ibid.*) Consideration of three "distinct factors" then indicates what process is due: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citation.]" (*Id.* at p. 335.) The California Supreme Court used these same factors to determine whether the refusal to permit an alleged SVP to testify in his trial resulted in a denial of due process. (*People v. Allen* (2008) 44 Cal.4th 843, 862–863 [80 Cal.Rptr.3d 183, 187 P.3d 1018].)

 Applying the *Mathews* test, the court found Litmon had been denied due process. It then turned to the test announced in another due process case, *Barker v. Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101, 92 S.Ct. 2182], where the Supreme Court set forth the criteria to be used by courts to judge whether a criminal defendant's speedy trial component of due process has been violated. (*Id.* at pp. 515–516.) The high court recognized that it is "impossible to determine with precision *when* the right has been denied" (*id.* at p. 521, italics added), and that it "cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate" (*ibid.*, fn. omitted). Application of the *Barker* analysis requires courts to keep in mind that " '[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances.' " (*Id.* at p. 522.)

The court rejected a proposed rule that would require a prior demand for a speedy trial as a prerequisite to consideration of a speedy trial claim. The proposed rule, in effect, presumed a waiver of the constitutional right and was diametrically opposed to the court's pronouncements on waiver of constitutional rights: a waiver requires " 'an intentional relinquishment or abandonment of a known right or privilege.' [Citation.]" (*Barker v. Wingo, supra,* 407 U.S. at p. 525.) Although the court rejected "the rule that a defendant who fails to demand a speedy trial forever waives his right" (*id.* at p. 528, fn. omitted), it held the "assertion of or failure to assert [the] right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of

the right." (*Ibid.*) The court announced four factors to be weighed in deciding a speedy trial claim: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker v. Wingo, supra*, 407 U.S. at p. 530, fn. omitted.)

The court noted that the length of delay is more or less a triggering device for the speedy trial claim. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Barker v. Wingo, supra*, 407 U.S. at p. 530.) Just what that delay is will vary depending upon the circumstances of the case. For example, what may be acceptable in the prosecution of a serious and complex conspiracy case would not pass muster in a run-of-the-mill street crime. (*Id.* at p. 531.)

Under the prejudice prong of the *Barker* analysis, the court indentified three interests to be considered: prevention of oppressive pretrial confinement; minimization of anxiety and concern by the person confined; and limiting possible impairment of the confined person's defense. (*Barker v. Wingo, supra*, 407 U.S. at p. 532.) Here too, the court found Litmon had been denied due process. (*Litmon II, supra*, 162 Cal.App.4th at p. 406.)

2. *Analysis*

Neither the California Supreme Court nor the United States Supreme Court has decided what test is to be applied in deciding a due process/timely trial claim in an SVP proceeding. Therefore, like the *Litmon II* court, we review appellant's claims under both the *Mathews* and *Barker* tests.

a. *Delay Preceding the First Trial*

As stated above, the petition in this matter was filed on October 19, 2000. The first trial did not take place until June 6, 2006. By that time, appellant had twice moved to dismiss the petition: once on May 31, 2006, and once prior to the start of trial on June 6. The delay until at least November 2005 appears to have been the result of defense strategy and change of attorneys. The overwhelming amount of delay between the filing of the petition and the setting of the November 2005 trial date was the result of appellant's requests or continuances stipulated to by appellant. Indeed, for a substantial period between the filing of the petition and the November 2005 trial date, the matter was continued repeatedly without setting any trial date. In any event, appellant does not allege this initial delay violated due process, nor could he given the fact it was with his consent and/or at his request. He does, however, contend the delay from December 12, 2005, to June 6, 2006, the date his first trial began, violated due process.

### i. *Misconduct*

In addition to appellant's claim that this delay violated due process as announced in *Litmon II*, he also argues the delay resulted from prosecutorial misconduct. In connection with this latter argument, appellant asserts defense counsel was deceived by the deputy district attorney handling the matter in November 2005 and would have had his trial earlier but for the deception.

Appellant's trial had been set for November 14, 2005. Ten days before that date, the trial date was continued to December 12, 2005. In obtaining that continuance, Deputy District Attorney Do represented to the court that he had spoken with Levine regarding the change in an evaluator's opinion about appellant's status as an SVP. Do said the change in opinion was the reason they were asking to continue the trial to December 12, 2005. On December 12, 2005, the parties agreed to vacate the trial date and set the matter for a January 13, 2006 pretrial without a backup trial date. Attorney Liza Tom appeared specially for Levine and waived time on appellant's behalf.

Appellant's initial motion to dismiss alleged that in early December 2005, Do represented to Levine—presumably as a result of the evaluator's change of opinion—that he (Do) would either dismiss the case on or about January 9, 2006, or be prepared to go forward with the trial. The motion further alleged "Do was merely delaying the proceedings so that he could avoid doing the trial. Mr. Do had planned, and did, leave the office of the District Attorney the first week in January 2006."

Appellant correctly acknowledges the record does not demonstrate Do deceived appellant's attorneys and obtained the delay to avoid trying the case. He blames that failure on the court for not holding an evidentiary hearing on his motion. The motion to dismiss was argued by the parties and denied by one judge on May 31, 2006, and another judge on June 6, 2006. At no time on either occasion did appellant seek an evidentiary hearing to establish what he alleged in the motion. Rather, each time counsel simply argued the purported merits of the motion without requesting an evidentiary hearing or objecting to the lack of an evidentiary hearing. Therefore, the issue of the superior court's failure to hold an evidentiary hearing appellant never requested has not been preserved for appeal.

 " 'In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court. [Citation.] "The rule that contentions not raised in the trial court will not be considered on appeal is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law." [Citations.] Otherwise, opposing parties and trial courts would be deprived of

opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources "to address purported errors which could have been rectified in the trial court had an objection been made." [Citation.] In addition, it is inappropriate to allow any party to "trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." [Citation.]' " (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799–800 [99 Cal.Rptr.3d 464].)

### ii. *Due Process Delay*

After Do left the district attorney's office, another deputy district attorney was assigned to appellant's matter. Deputy District Attorney Burke appeared at the January 13, 2006 pretrial. The parties stipulated to continue the pretrial to February 17, 2006. At the February appearance, Burke informed the court she had recently taken over Do's caseload of approximately 44 cases, she had briefly reviewed appellant's file, and it did not appear to contain all the reports from the various experts. She said that just that day she had been handed a report by Dr. Donaldson and would need to take his deposition. She then requested a trial date at the end of May 2006.

Levine told the court the parties had exchanged all doctors' reports before the November 14, 2005 trial date, he had personally given Do the report by Donaldson, and gave Burke the report because she could not find the copy he previously provided Do. He said the only reason the November 2005 trial date was continued was because an expert changed his opinion and concluded appellant was not an SVP and, in light of that development, Do asked for a month to review the report, but Do left the district attorney's office. Levine then asked for a trial date in early May or early April 2006. The court set the matter for trial early May 2006.

When the matter came for trial on May 8, 2006, the parties—each for their own reasons—sought to trail the trial to May 17, 2006. The court attempted to trail the trial to May 10, 2006, and still accommodate the attorneys' calendaring and witness availability problems. Levine said that would not work for him because he had made arrangements to attend his son's out-of-state graduation. The court then granted the parties' mutual request to trail the trial to May 17, 2006.

The People answered ready for trial on May 17, 2006, and the court placed counsel on one-hour call to await assignment to a trial court. The next day, Thursday, May 18, 2006, the court trailed the trial to May 22, 2006. Thereafter, the matter trailed day to day until May 25, 2006, at which point the court trailed the matter to May 30, 2006. On May 30, 2006, the court

again trailed the matter to the next day. Appellant then filed a motion seeking dismissal or immediate assignment based upon a prejudicial delay in commencing a trial.

In addition to the allegations of misconduct in obtaining a continuance of the November 2005 trial date (*ante*), the motion made it appear the May 8, 2006 trial date and the continuance from May 8 to May 17, 2006, were both made at Burke's request. It omitted any reference to the fact that Levine had asked for a trial date in early May or April 2006 when Burke had asked for a trial date at the end of May, and that Levine had joined in the request to trail the trial from May 8 to May 17, 2006.

Because the court set the trial in early May 2006 in compliance with appellant's request and the trial was trailed to May 17, 2006, at both parties' requests, the timeframe we must be concerned with in connection with appellant's first motion to dismiss is from May 17, 2006, until June 6, 2006, when trial began. The nearly five-year-and-seven-month delay prior to the parties answering ready passed with appellant's consent, to say the least. We find this unconsented-to 20-day delay did not deny appellant due process.

Clearly appellant's interest in being free of confinement is of primary importance. The delay of which appellant may claim, however, is relatively minimal. The fact that appellant had already spent more than five years in pretrial confinement before this 20-day period began should be considered in assessing whether a due process violation has occurred. (*Litmon II, supra,* 162 Cal.App.4th 402.) However, even considering that period of time, we do not find the 20-day delay between the time appellant answered ready for trial and the time his trial actually began resulted in a due process violation when other relevant factors are considered.

In June 2006, the assessable risk of an erroneous deprivation was not substantial. There had been a determination of probable cause, as there would be in all SVP matters that proceed to trial. Granted that determination had not been reached after a contested hearing, but the only reason such a hearing was not held was because appellant waived his right to a probable cause hearing. Still, there was some risk involved. At least one expert had changed his mind about whether appellant qualified as an SVP, as occurs from time to time in SVP proceedings. The government's interest as described in *Litmon II* is the same in all SVP proceedings. Taking these factors into consideration, however, we cannot say a 20-day delay from the first point in time appellant stopped consenting to further delays denied him due process under the *Mathews* test.

Neither did it result in a due process violation using the *Barker* test. As the court stated in *Barker v. Wingo, supra,* 407 U.S. 514, "A balancing

test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." (*Id.* at p. 530.) In other words, there is no algebraic formula. The court must use its informed judgment in assigning the weight to be allocated to each factor considered in a given case.

Here, the *length of delay* was extreme if the entire delay is considered. The proceedings started in late 2000, and the trial did not get underway until the first week of June 2006. However, the *reason for the delay* was, for the most part, because appellant either asked for it or stipulated to it, often with what were purported to be time waivers. On the other hand, the length of the delay to which appellant did not consent is relatively short. The reason for that delay was court congestion. Although "any chronic, systematic postdeprivation delays in SVP cases that only the government can rectify must be factored against the People" (*Litmon II, supra,* 162 Cal.App.4th at p. 403), the delay in finding a trial court for appellant's case at the end of May and the beginning of June 2006, does not appear to have been caused by a chronic and systematic problem. As the calendar court judge informed appellant on May 31, 2006, "You've happened to find us on a particular two week spree." The court stated that it expected to find appellant an available courtroom the next Monday, after "people [come] back from vacations," but that at present, "every single court . . . is in trial."

Appellant's *assertion of his right* to a timely trial did not occur until May 31, 2006, after the case had trailed in a ready status for two weeks. At that time appellant sought an immediate trial or dismissal. The *prejudice* suffered by appellant was his continued confinement. There is no allegation that the result of the first trial, already favorable, would have been any more favorable had he received his trial in the middle of May 2006, instead of early June 2006. There was no discernable prejudice caused by this 20-day delay.

Appellant makes much of the fact that he had been in custody awaiting trial since 2000. He asserts the delay prior to his first trial was more egregious than that in *Litmon II.* It must be remembered, however, that appellant requested or agreed to continuances until the middle of May 2006. This is not to say a five-year delay between the filing of an SVP petition and trial is appropriate. But when that delay was at appellant's request or with his consent, the weight accorded the delay is reduced. (*Barker v. Wingo, supra,* 407 U.S. at p. 529.) A potential civil committee may not seek to continue his trial over and over again and then be heard to complain the court violated due process by granting his requests.

In *Litmon II,* the critical delay occurred after Litmon's trial ended in a mistrial on March 10, 2006. On April 7, 2006, Litmon's counsel said she was

ready to retry the matter " 'right now' " and that her witnesses were available on the 26th, 27th, and 28th of April. (*Litmon II, supra*, 162 Cal.App.4th at pp. 391–392.) The court, however, set the trial for January 2007, *nine months* off. (*Litmon II, supra*, 162 Cal.App.4th at pp. 391–392.) The purpose of the delay was to enable the district attorney to " 'lock down' " a time when his witnesses would be available. (*Id.* at p. 391.) Then just days before trial, the trial was continued into March 2007, because the district attorney had not subpoenaed his witnesses in a timely fashion and three of the witnesses had already been subpoenaed to testify in other matters. (*Id.* at pp. 393–394.) This amounted to an 11-month delay in providing Litmon a trial. The unconsented-to delay in appellant's matter does not approach the 11-month delay, or even the two-month delay after the initial nine-month delay in *Litmon II*. The unconsented-to delay in appellant's case, a matter of less than three weeks, does not raise a presumption of prejudice. (*Barker v. Wingo, supra*, 407 U.S. at p. 530 ["Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."].) Accordingly, we find this delay did not violate due process.

### b. Delay in the Second Trial

The first trial resulted in a mistrial on June 21, 2006, when the jury hung 11 to one in favor of finding the petition not true. A second trial was set for August 14, 2006. Within two weeks of the earlier mistrial, the district attorney requested updated evaluations because the prior evaluations were "approximately one year old," i.e., stale. (*Albertson v. Superior Court, supra*, 25 Cal.4th 796 [evaluation more than one year old is stale and entitles the district attorney to obtain current evaluation].) The court eventually granted the request after briefing by both sides.

On Monday, August 14, 2006, the date set for trial, the district attorney sought an order permitting the opening and search of the recently discovered boxes sent by appellant from the hospital, an order permitting the district attorney to review certain sealed records, and a continuance of the trial date to permit further trial preparation. Appellant's attorneys opposed each motion and asserted that the district attorney's motions were made in order to delay the trial and not for the purposes set forth in the moving papers. The matter was continued to that Friday for the judge who presided over the first trial to hear the motions.

On Friday, August 18, 2006, the court granted the district attorney's request for a continuance and set the trial for September 11, 2006. The hearing on the issues concerning the boxes was continued to permit appellant's attorneys to brief the matter. On August 25, 2006, the date set for hearing on the issues concerning the boxes, the trial was continued at appellant's request to October 30, 2006.

On October 30, 2006, the trial was continued to February 13, 2007, again at appellant's request.[10] The deputy public defender appearing specially for appellant's attorneys informed the court the reason for the request was that Aye, one of appellant's attorneys, was scheduled for back surgery in December and, since it was believed the trial would not begin within one week, Aye could not finish the trial before the scheduled surgery.

On January 19, 2007, prior to the trial date that had been set at appellant's request, another deputy public defender, Douglas Lobato, appeared specially for appellant's attorneys and waived appellant's presence. The court vacated the February 13 trial date and set the matter for a March 9, 2007 pretrial, with no backup trial date. There is no reporter's transcript for that hearing. The only reasonable inference is that the continuance was either at appellant's request or with his consent, given the fact neither of appellant's attorneys appeared at the hearing, the appearance was well before the scheduled trial date such that had there been an objection to the continuance a future date could have been rescheduled for appellant's opposition, and we cannot conceive that the experienced deputy public defender would have consented to make the special appearance if appellant's counsel objected to the continuance. In other words, Lobato would not have agreed to make a special appearance to argue on behalf of appellant, who was not his client, in opposition to a *contested* People's motion to continue.

At the pretrial on March 9, 2007, appellant stipulated to continuing the pretrial to April 6, 2007, again with no backup trial date. On April 6, 2007, with no trial date in existence, the district attorney moved to reopen discovery to permit the People to demand exchange of experts, production of documents, and to notice the deposition of appellant's experts. That motion was continued to April 20, 2007. There is no reporter's transcript for the April 6 appearance, but there is nothing in the court's minutes indicating appellant was opposed to the continuance date or that appellant requested the setting of a trial date. Given appellant's attorneys' admirable proclivity for filing formal responses to the district attorney's numerous motions filed throughout the course of the proceedings, the matter may have been continued to permit preparation of an opposition. In any event, the minute order does not reflect any objection to the date.

The People's discovery motion was granted on April 20, 2007, and the court scheduled the trial for June 18, 2007, a date selected by appellant's counsel. The deputy district attorney answered ready on the trial date and the court trialed the matter to the next day. On June 19, 2007, the court continued the trial at appellant's request because Levine was engaged in trial and could

---

[10] An October 17, 2006 letter from Pope to Levine stated she would be answering ready for trial, and asked whether Levine intended to answer ready.

not "be ready for trial." Aye asked the court to continue the trial to July 9, 2007, "subject to the availability of witnesses." On July 9, 2007, the trial was again continued at appellant's request because Levine had injured his back and anticipated surgery. November 5, 2007, was selected for the retrial.

Both parties answered ready on November 5, 2007. The deputy district attorney gave a 20-day estimate. The parties were placed on one-hour call and the matter trailed throughout the month until November 27, 2007, when appellant filed a motion to dismiss for failure to commence trial in a timely fashion. The court denied the motion and denied appellant's request to give the case "some kind of preference" under Code of Civil Procedure section 36. The case continued to trail. On December 4, 2007, the case was assigned to Judge Hoffer for trial, but appellant's attorneys filed a Code of Civil Procedure section 170.6 peremptory challenge against the judge and the matter returned to trailing status until December 11, 2007, when appellant filed another motion to dismiss, this time based on equal protection grounds. The equal protection argument was based upon the fact that a person alleged to be a mentally disordered offender is entitled to a trial within 60 days of the petition seeking a commitment. (Pen. Code, § 2966, subd. (b).) The court denied the motion and assigned the matter to Judge King's court for trial, where the case continued to trail until the court began hearing pretrial motions on December 18, 2007. A mistrial was declared on February 6, 2008, when the jury was unable to reach a unanimous verdict.[11]

To sum up, the court declared a mistrial in the first trial on June 21, 2006. The second trial did not begin until December 18, 2007, almost 18 months later. Although the retrial had been scheduled to start on August 14, 2006, within 60 days of the initial mistrial, litigation on other issues delayed the trial for 11 days, at which point, on August 25, 2006, the matter was repeatedly continued at appellant's request and eventually, again at appellant's request, the jury trial date was vacated and the matter was set for a pretrial with no jury trial date pending. This accounts for almost six and a half months of the delay. Thereafter, the court set a June 18, 2007 trial date at appellant's request. The trial was then delayed twice more at appellant's request until November 5, 2007, accounting for another month and a half of the delay. Of this more than 17-month period, more than 14 months of the delay between mistrial and the start of the second trial passed at the request of appellant's attorneys.

---

[11] The reporter's transcript does not contain a numerical breakdown in the second trial. Levine, in urging the trial court to exercise its discretion and dismiss the petition after two failed trials, represented the second jury hung eight to four, but he did not state which side the split favored. Had the spilt again favored appellant, we strongly suspect that point would have been made.

The record does not contain specifics about the reason(s) the case trailed in a ready status for 43 days, other than court congestion and the court's failure to provide any preference to SVP cases.[12] It is evident from statements made by the various judges who presided over hearings in this matter that the court did not focus on the constitutional need to proceed to trial in a timely fashion. It was repeatedly observed by the superior court that there was no *statutory* time limit in which an SVP trial must be had. That, of course, is true. But there is a separate and independent constitutional right to have a trial in a timely fashion. Needless to say, 17 months would seem to be outside that timeframe. However, that 17-month period is not attributable to the district attorney or the court. Although the court and the district attorney bear ultimate responsibility for providing a timely trial to a person against whom an SVP petition has been filed (*Litmon II, supra*, 162 Cal.App.4th at p. 406), and the total time the person has spent in pretrial confinement must be considered (*id.* at pp. 404–405), this does not mean delay caused or requested by the person who is the subject of the petition must be given the same weight as delay caused by the government. Were the rule otherwise, an alleged SVP able to continue his matter on his own motions to a point deemed oppressive in connection with postdeprivation confinement, could then move to have the petition dismissed and avoid a potential indeterminate commitment to a state hospital under the SVPA.

Appellant's interest at stake remained constant. The longer he remained confined, the greater weight the confinement accrues. Moreover, the risk of an erroneous deprivation increased since the first trial, that jury having come within one vote of finding the petition not true. As with appellant's confinement, the government's interest remains constant as well. The delay in retrying appellant, however, did not deny him due process.

The court set a timely date for retrial. The initial delay of less than a month, after setting the timely trial date, was necessitated by litigation on issues that arose in the case, including whether the district attorney should be permitted to unseal and search the more than a dozen boxes of materials appellant sent out of the hospital to Galbraith for safekeeping. Appellant's attorneys aggressively defended him on that issue and others. The remainder of the delay, up until November 5, 2007, was at appellant's request. Trailing an SVP trial for more than 40 days because an open courtroom cannot be found is unsatisfactory. However, given the fact that the preceding 14-month-plus delay was at appellant's request, we find the delay from November 5,

---

[12] As noted earlier, the case had actually been sent out to a trial court weeks earlier, but appellant disqualified the assigned judge. We include in this 43-day period the time before and after the original assignment as appellant should not be penalized in any manner for the filing of the challenge.

2007, to the start of trial proceedings on December 18, 2007, did not amount to a denial of due process under the *Mathews* analysis.

Neither did the delay violate due process under the *Barker* analysis. The unconsented-to delay was not presumptively prejudicial, although there was no acceptable justification for it and appellant objected to it. Moreover, the delay did not appear to have resulted in any prejudice at trial, which again resulted in a hung jury.

### c. *Delay in the Third Trial*

The mistrial in appellant's second trial was declared on February 6, 2008. Appellant's counsel requested the case be reset for trial within a short period of time and that the case remain in Judge King's courtroom so appellant would not return to a criminal calendar department and again have to wait six weeks to be assigned out to a trial court after answering ready. The judge scheduled a trial setting conference in his court for February 22, 2008, but advised counsel there were no guarantees and, if the court were engaged in trial or if a criminal matter had to be tried, appellant's case would have to return to criminal presiding.

On February 22, 2008, Judge King set the matter for a March 17, 2008 trial date at appellant's request and denied the People's request for a June 9, 2008 trial date. Pope stated the reason for the requested June date was that she was leaving the district attorney's office and another deputy would take over the case. The court advised the attorneys it was required to schedule appellant's trial date in a different courtroom, because the superior court has changed "the way . . . business is being handled."

On March 17, 2008, appellant's attorney, Levine, and Deputy District Attorney Wagner announced ready for trial. Wagner also moved for an order directing appellant to submit to interviews by two state-retained experts. Because the parties agreed the motion should be heard by Judge King, Judge Borris set the matter back in Judge King's courtroom for March 21, 2008.

On March 21, 2008, the court ordered appellant to submit to an interview by one state-appointed expert, stayed the order until the case gets assigned to a trial court, and permitted discovery to be reopened. The issue of the scope of the interview was continued to March 28, 2008, and then, based upon a stipulation, to April 4, 2008.

Meanwhile, the trial appears to have continued trailing in department C4, the calendar court. On April 28, 2008, Judge Borris informed the parties he sent out two of five trailing SVP cases, and anticipated appellant's trial would

be able to start within two weeks. The court ordered the parties back on May 16, 2008. When the parties appeared on that date, appellant renewed his motion to dismiss. The court denied the motion and ordered the parties to return on June 6, 2008, with the understanding that the court would notify counsel if a court became available before then.

The matter was assigned to Judge Donahue's courtroom for trial on June 23, 2008, 98 days after the case was called for trial and the parties answered ready. On June 26, 2008, defense counsel again unsuccessfully argued for dismissal due to prejudicial delay in bringing appellant to trial. Jury selection began on June 30, 2008.

We find no violation of due process in the delay in providing appellant his third trial. His second trial ended in February 2008. Retrial occurred within four and a half months of the declaration of mistrial, even with a new deputy district attorney assigned to the case in the interim. " 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances.' " (*Barker v. Wingo, supra*, 407 U.S. at p. 522.) Here, the delay was not unreasonable given a new lawyer was assigned to the case after the mistrial, the complexity of the case, the number of experts involved, the reports to be read and digested, and the consideration to be given to the prior testimony of a number of witnesses in the two prior trials. "To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." (*Barker v. Wingo, supra*, 407 U.S. at p. 531.)

In *Litmon II*, the court found the 11-month delay violated due process. (*Litmon II, supra*, 162 Cal.App.4th at p. 404.) That delay consisted of an initial trial date set nine months out and then an additional two-month continuance due to the district attorney's failure to timely subpoena its experts. (*Id.* at p. 403.) The court found that even if the initial nine-month delay did not violate due process, the two-month continuance thereafter did, given the fact that the retrial had already been delayed for nine months. (*Id.* at pp. 404–405.) Here, the delay consisted of a total of 98 days after the date appellant requested for trial.

█ While the delay due to court congestion is not excusable, neither was this delay presumptively prejudicial. In criminal cases, "lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year. [Citations.] We note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry. [Cita-tion.]" (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1 [120 L.Ed.2d

520, 112 S.Ct. 2686].) Accordingly, we conclude the 98-day delay in providing appellant a trial after the second mistrial did not violate due process.

F. *Challenges to the SVPA, as Amended by Proposition 83*

██ Prior to the electorate's passage of Proposition 83 on November 7, 2006, the SVPA authorized a two-year commitment of a person found to qualify as an SVP. (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 811, fn. 7 [114 Cal.Rptr.3d 199, 237 P.3d 530].) "Subsequent commitments extending the term for two years could be obtained under procedures similar to those regulating initial commitments. [Citation.]" (*Ibid.*) With Proposition 83's amendment of the SVPA, a person found to qualify as an SVP is committed to DMH for an indeterminate term (§ 6604), thus eliminating the necessity of extension commitments. (See Historical and Statutory Notes, 73E West's Ann. Welf. & Inst. Code (2010 ed.) foll. § 6604.1, pp. 162–163.) In lieu of the extension procedure, Proposition 83 requires a person committed as an SVP to have annual mental examinations. The resulting annual report includes consideration of whether the person continues to meet the definition of an SVP. (§ 6605, subd. (a).) If the report concludes that person no longer meets the definition of an SVP, or that the best interest of the person requires conditional release and the community can be adequately protected if the person is so released, the SVPA provides a procedure for judicial review and termination of the commitment. (§ 6605, subds. (b)–(f).) Appellant contends the amendments to the SVPA violate a number of constitutional provisions.

### 1. *Due Process and Ex Post Facto*

Appellant asserts that because his commitment under the SVPA is indefinite and once he has been committed he bears the burden of proving he no longer qualifies for commitment, the SVPA violates due process and is an ex post facto law. His claims have been considered and rejected by our Supreme Court in *McKee I, supra*, 47 Cal.4th 1172, 1193 (due process claim), 1195 (ex post facto claim). We therefore reject these claims. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

### 2. *Double Jeopardy*

Appellant next argues the SVPA violates double jeopardy because an indefinite commitment with the burden placed upon him to prove he no longer qualifies as an SVP means the SVPA has become punitive, rather than civil in nature. He cites the high court's decision upholding the Kansas SVP Act, *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*). However, his argument fails to explain why California's SVPA should be deemed punitive under *Hendricks*, other than his bare

assertion that Proposition 83's amendments eliminated "many of the protections and procedures" of the Kansas laws, transforming the SVPA into a criminal law. This leaves to us the problem of deciphering the changes and their purported relevance to the issue. Hence, his argument is vague, unsupported, and impossible to evaluate. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

Nonetheless, the *Hendricks* court stated the categorization of a statute as criminal or civil is a question of statutory construction. (*Hendricks, supra,* 521 U.S. at p. 361.) We first look to whether a civil proceeding was intended. (*Ibid.*) The SVPA is located in the Welfare and Institutions Code, where the Lanterman-Petris-Short Act—another civil commitment procedure (§ 5000 et seq.)—is located, not in the Penal Code. This is some evidence of an intention to enact a civil procedure. (*Hendricks, supra,* 521 U.S. at p. 361.) "Nothing on the face of the statute suggests that the legislature [or electorate] sought to create anything other than a civil commitment scheme designed to protect the public from harm." (*Ibid.*)

██ Even though a civil commitment procedure was intended, that intent is not dispositive when there is " 'the clearest poof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' [Citation.]" (*Hendricks, supra,* 521 U.S. at p. 361.) A state's intent to restrict the freedom of the dangerously mentally ill is "a legitimate nonpunitive governmental objective." (*Id.* at p. 363.) The SVPA seeks to restrict the freedom only of those who qualify as SVP's. Upon a showing the person no longer meets the qualifications of the SVPA, the person is entitled to release. (§ 6605, subds. (b)–(f).) ██ Consequently, we do not perceive a punitive purpose, "an essential prerequisite" of a double jeopardy claim. (*Hendricks, supra,* 521 U.S. at p. 369; see *People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1226 [106 Cal.Rptr.2d 490] [rejecting double jeopardy challenge to SVPA].) Accordingly, we find that appellant's commitment under the SVPA does not violate double jeopardy.

### 3. *Equal Protection*

██ The right to the equal protection of the laws is found in article I, section 7 of the California Constitution and in the Fourteenth Amendment of the United States Constitution. "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].)" (*People v. Brown* (2012) 54 Cal.4th 314, 328 [142 Cal.Rptr.3d 824, 278 P.3d 1182].) Decisions of the United States and California Supreme Courts "have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens. [Citations.]" (*McKee I, supra,* 47 Cal.4th at p. 1199.)

Appellant complains that in making a commitment indeterminate under the SVPA and thereafter placing the burden on the SVP to obtain release, SVP's are treated more harshly than similarly situated involuntary civil committees. The first step in any equal protection analysis is to determine whether two or more groups are " ' "similarly situated for purposes of the law challenged." ' [Citation.]" (*McKee I, supra,* 47 Cal.4th at p. 1202.) In *McKee I,* the Supreme Court found SVP's are similarly situated with individuals who have been found to be MDO's under the Mentally Disordered Offender Act (Pen. Code, § 2960 et seq.). (*McKee I, supra,* 47 Cal.4th at p. 1203.) Both " 'have been found, beyond a reasonable doubt, to suffer from mental disorders that render them dangerous to others.' " (*Ibid.*) " 'Furthermore, the purpose of the MDO Act and the SVPA is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' [Citations.]" (*Ibid.*) MDO's are not committed for an indeterminate period and cannot be confined beyond the statutory determinate term absent periodic proof beyond a reasonable doubt that the person continues to suffer from a mental disorder and is dangerous. (*Id.* at pp. 1201–1202.) In other words, the SVPA treats SVP's more harshly than the similarly situated MDO's. "[I]mposing on one group an indefinite commitment and the burden of proving they should not be committed, when the other group is subject to short-term commitment renewable only if the People prove periodically that continuing commitment is justified beyond a reasonable doubt, raises a substantial equal protection question that calls for some justification by the People." (47 Cal.4th at p. 1203.)

Because such confinement involves a fundamental liberty interest, the difference in treatment between MDO's and NGI's on the one hand and SVP's on the other is subject to strict scrutiny under an equal protection analysis. (*McKee II, supra,* 207 Cal.App.4th at p. 1332, citing *McKee I, supra,* 47 Cal.4th at pp. 1184, 1197–1198, 1208–1209.) Under a strict scrutiny analysis, the state is required to demonstrate the difference in treatment is necessary to serve a compelling state interest. (*McKee I, supra,* 47 Cal.4th at pp. 1197–1198, quoting *In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097].) The state has a compelling state interest in protecting society from dangerous persons and in its treatment of those confined due to mental illness. (*McKee I, supra,* 47 Cal.4th at pp. 1203–1204.)

In *McKee I,* the Supreme Court remanded the matter to the trial court to provide the People an opportunity to show "that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I, supra,* 47 Cal.4th at p. 1208.) The court provided some guidance to the trial court, stating the requisite showing may be made by demonstrating "the inherent nature of the SVP's mental disorder makes recidivism as a class

significantly more likely. Or it may be that SVP's pose a greater risk to a particularly vulnerable class of victims, such as children. Of course, this latter justification would not apply to SVP's who have no history of victimizing children. But in the present case, McKee's previous victims were children. Or the People may produce some other justification." (*Ibid.*, fn. omitted.)

On remand after the decision in *McKee I*, the trial court conducted a 21-day evidentiary hearing, at the conclusion of which the trial court found the People carried their burden to justify the disparate treatment of SVP's (*McKee II, supra*, 207 Cal.App.4th at p. 1330), by presenting "substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id.* at pp. 1330–1331.)

We grant defendant's request to take judicial notice of the trial court's statement of decision in *McKee II*. (Cal. Rules of Court, rule 8.252; Evid. Code, § 452, subd. (d).) The statement of decision summarized the evidence admitted at the 21-day hearing. We agree with our brethren in Division One. The People introduced "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different. That evidence and the evidence on recidivism . . . , as the trial court found, 'supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.' In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative. As the trial court found, 'the large majority of SVP's simply are not motivated to enter treatment or to succeed in it if they do begin it.' " (*McKee II, supra*, 207 Cal.App.4th at p. 1347.) This substantial amount of evidence supports the electorate's reasonable inference "that an indeterminate, rather than a determinate (e.g., two-year), term of civil commitment supports, rather than detracts from, the treatment plans for SVP's." (*Ibid.*)

We reject defendant's contention that the *McKee II* court misapplied the standard of review. It reviewed the evidence de novo. "We believe we are in as good a position as the trial court to decide whether the evidence presented by the People during the remand hearing satisfied their burden to justify the disparate treatment of SVP's under the [SVPA]." (*McKee II, supra*, 207 Cal.App.4th at p. 1338, fn. 3.) The appellate court agreed with the trial court

that the People produced *substantial evidence* to justify the disparate treatment. (*Id.* at pp. 1330–1331.)

Lastly, we find the reasoning and conclusion of *McKee II* persuasive. Defendant has made no showing he would be able to introduce any new or different evidence that would require a different result. Accordingly, we reject defendant's equal protection challenge to the SVPA.

## III

## DISPOSITION

The judgment is affirmed.

O'Leary, P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied February 28, 2013, and appellant's petition for review by the Supreme Court was denied May 22, 2013, S209450.