Filed 3/2/21; Certified for publication 3/23/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B297845 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM013245) |
| v. | |
| SON TRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge. Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2008, the Los Angeles County District Attorney's Office filed a petition to civilly commit defendant and appellant Son Tran under the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code, § 6600 et seq.)[1] More than four years later, in 2012, the trial court found probable cause that defendant was likely to engage in sexually violent predatory criminal behavior upon release. Nearly four years after that, in 2016, the petition was tried to a jury. The jury deadlocked, and a mistrial was declared. Two and one-half years later, in 2019, a bench retrial commenced. Finding that defendant qualified as a sexually violent predator (SVP), the trial court committed him to a state hospital for treatment and indeterminate confinement.

On appeal, defendant does not challenge the sufficiency of the evidence supporting his civil commitment. Rather, he contends that the 11-year span between the filing of the petition and the retrial violated his constitutional right to due process.

We affirm.

## BACKGROUND[2]

### I. *Criminal History*

In 1981, defendant was convicted of two counts of lewd or lascivious acts involving a child under the age of 14. (Pen. Code, § 288, subd. (a).)

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Our ability to summarize what occurred below was greatly limited by the appellate record. Many documents, including court minute orders, are missing.

In 1985, he was convicted of kidnapping for child molestation (Pen. Code, § 207, subd. (b)) and child molestation with a prior (former Pen. Code, § 647a).

In 1986, he was convicted of forcible child molestation (Pen. Code, § 288, subd. (b)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and false imprisonment (Pen. Code, § 236).

II. *SVP Petition; Waiver of Time for Probable Cause Hearing*

The petition to commit defendant as an SVP was filed on May 15, 2008 (SVP petition).

On June 4, 2008, at the first hearing following the filing of the SVP petition, the trial court appointed Deputy Public Defender Karen King (King) to represent defendant. Pursuant to section 6601.5, the trial court reviewed the petition and found that it was facially sufficient. It informed defendant that he was entitled to a probable cause hearing within 10 days. King stated that she had discussed waiving that time requirement with defendant. With defendant's agreement, the probable cause hearing was set for July 16, 2008.

III. *Defendant's First Motions to Strike Psychologist Evaluations; Continuances of Probable Cause Hearing*

On July 16, 2008, King indicated that she wanted to have a motion to strike a psychologist's report heard simultaneously with the probable cause hearing. The matter was continued to September 2008.

There were at least two hearings in the fall of 2008. Then all we know from the limited appellate record provided is that (1) in January 2009, defendant filed two motions to strike psychologist evaluations, which were denied; (2) in April 2009, the probable cause hearing was continued, with defendant's consent, to June 2009; (3) in January 2010, on defendant's

3

motion, the matter was continued to February 2010; and (4) in March 2010, the matter was continued again to May 2010.

IV. *Defendant's Motion for New Evaluations*

In April 2010, defendant filed a motion, pursuant to *In re Ronje* (2009) 179 Cal.App.4th 509 (*Ronje*), disapproved of in part by *Reilly v. Superior Court* (2013) 57 Cal.4th 641 (*Reilly*),[3] that he was entitled to new evaluations conducted under a valid protocol, to be followed by a probable cause hearing based on those new evaluations. With the parties' agreement, the hearing on the motion was continued, first, from May 2010 to June 2010, and then to July 2010.

On July 22, 2010, the trial court granted defendant's motion for new evaluations but denied his request for new evaluators. Defendant agreed to waive time and to have the probable cause hearing setting take place in October 2010.

V. *Defendant's New Counsel; Defense Requests for Continuances*

Deputy Public Defender Tom Tibor (Tibor) appeared for the first time as defendant's attorney on October 5, 2010.[4] Tibor had

---

[3]     *Ronje*, *supra*, 179 Cal.App.4th at p. 513, concluded that the assessment protocol used to evaluate the subjects of SVP commitment petitions was an invalid underground regulation. The appropriate remedy was to order new evaluations using a valid protocol and to conduct a new probable cause hearing based on the new evaluations. (*Id.* at p. 514.) The California Supreme Court later held "that relief arising from use of an invalid protocol in an SVP evaluation should depend on a showing that the error was material" and disapproved of *Ronje* to the extent it "omitted the materiality requirement[.]" (*Reilly*, *supra*, 57 Cal.4th at p. 655.)

[4]     We do not know why King was no longer representing defendant.

4

interviewed defendant the previous day and was informed that neither evaluator had seen defendant yet. The matter was continued to January 2011.

Upon defense motions, the trial court granted additional continuances from January 2011 to April 2011 (for unknown reasons), from April 2011 to June 2011 (for time to obtain updated reports), and from June 2011 to July 2011 (because an evaluator had not completed her report). In July 2011, the trial court set the probable cause hearing for March 26, 27, and 28, 2012.

VI. *Defense Counsel's Health Problems; Defendant Objects to a Continuance*

On March 26, 2012, Tibor informed the trial court that he had medical problems that prevented him from proceeding with the probable cause hearing at that time. Defendant told the trial court that he did not "want to wait" and wanted the probable cause hearing to occur that day. After all, Tibor's medical issues were not his fault.

The trial court suggested that someone else in the public defender's office might be able to represent defendant. The trial court stated that it was "happy to do whatever" defendant and his attorney thought was in defendant's "best interest." It then suggested that the hearing be continued for a short time until Tibor was medically cleared to proceed, telling defendant that this option was "probably in [his] best interest" because of Tibor's familiarity with the case file.

Defendant reiterated that he wanted to have his probable cause hearing on that day and did not want to waive time. He complained that he had been in the county jail for three years six

5

months.  Tibor stated that no one else in his office was prepared to conduct the hearing on that day.

After further discussion, the trial court set another hearing for April 25, 2012, and reserved the week of July 16, 2012, for the probable cause hearing.[5]

VII.  *Probable Cause Hearing*

In August 2012, at a status conference for the probable cause hearing set for September 25 and 27 and October 10, 2012, Tibor informed the trial court that he "had trouble reaching [his] expert[,]" who had not yet interviewed defendant.  The People had already subpoenaed its two witnesses for the probable cause hearing.

At the next status conference, on September 18, 2012, it was confirmed that the probable cause hearing would be held on September 25 and October 4 and 12, 2012.  Tibor explained that defendant "seem[ed] to be somewhat upset . . . with the fact that [September] 27[] was moved to October 4."  Tibor stated that he tried to explain to defendant that the delay was to accommodate witnesses and was "a standard practice."

The probable cause hearing proceeded as scheduled on September 25 and October 4 and 12, 2012.  At the conclusion of the hearing, the trial court found probable cause, pursuant to section 6602, that defendant was likely to engage in sexually violent predatory criminal behavior upon release.  It ordered defendant to be transported to Coalinga State Hospital (Coalinga).

Defendant stated that he wanted to have his trial in 60 days.  The trial court was ready to send defendant out for trial

---

[5]     We do not know what occurred on April 25, 2012, or during the week of July 16, 2012.

6

and "assume[d] that the district attorney would be ready for trial." Tibor informed the trial court that the defense would not be ready for trial within 60 days.

The trial court requested that Tibor have a discussion with defendant. It noted that defendant "seem[ed] pretty clear that he would like his trial to be held sooner rather than later." It was "ready, willing, and able to do that as soon as [Tibor was] able to announce ready or [his] successor [was] able to announce ready for trial." A pretrial conference was set for December 2012. Defendant voiced his objection.

VIII. *Defendant's New Counsel; Additional Defense Requests for Continuances; Defendant's Objections*

December 12, 2012, hearing

On December 12, 2012, Tibor advised the trial court that he was going to retire by the end of the year and that the public defender's office "hasn't even contemplated yet who [was] going to replace [him]."

February 7, 2013, hearing

Defendant's new attorney, Deputy Public Defender Steve McManus (McManus), appeared on February 7, 2013. McManus explained that he had "not had a chance to read all of the materials" regarding defendant's case and wanted to come back for the pretrial conference in approximately 60 days. Defendant told the trial court that he wanted his trial within 10 days, but McManus indicated that he was not ready. The next hearing was set for April 2013.[6]

---

[6] On April 10, 2013, the matter was continued to May 15, 2013.

May 15, 2013, hearing

Defendant, who had recently been transported to Coalinga, was not in court on May 15, 2013. McManus suggested "a six-month date" to allow defendant time "to settle in and get some things done" at Coalinga. The trial court stated that a three-month date was necessary given that it was "a relatively old case." The trial court acknowledged that McManus was new to the case. "However," it explained, "the cases need to be moving toward trial more quickly than they have been. So simply because somebody is a recent arrival at Coalinga is not necessarily a good reason for putting off a trial date." The next hearing was set for August 2013.

August 6, 2013, hearing

On August 6, 2013,[7] the trial court asked how McManus would like to proceed. McManus responded that, because defendant had only been at Coalinga for about four months, he was "still settling in[.]" McManus wanted to put the case over for three months. He acknowledged that defendant was "anxious to go to trial," but stated that there were other issues involved. The trial court scheduled the next hearing for November 2013 and commented: "I would like to get this case moving as I know [defendant] would as well."

November 5, 2013, hearing

Defendant did not appear on November 5, 2013. McManus stated that there were some possible grounds for filing a motion

---

[7] At some point prior to August 6, 2013, defendant apparently filed, in propria persona, a petition for a writ, arguing that the trial court did not have jurisdiction over him because he was a citizen of another country. That writ was denied by a different judge in November 2013.

and planned to visit defendant later that month. McManus requested that the next pretrial date be set for early February 2014. When asked about his plans for the case, McManus referred to his difficulty communicating with defendant and stated that he was not sure when he would be ready for trial. The next hearing was scheduled for January 2014.

January 15, 2014 hearing

Defendant did not appear on January 15, 2014. McManus reported that he had visited defendant but there were communication problems. McManus questioned defendant's "competency, his ability to understand the proceedings and understand the nature of the charges against him." McManus also wanted additional time to research whether the SVPA applied to an undocumented alien with a current deportation order, as well as a competency issue.

The trial court acknowledged that McManus was "relatively new on this file" and wanted him "to have the opportunity to explore" the issues he had referenced. It continued the matter to March 2014 but was clear that it wanted "something actually happening" in the case in the interim.

March 5, 2014, hearing

On March 5, 2014, McManus reiterated his difficulties communicating with defendant and requested more time to research legal issues to possibly raise by motion. The trial court noted that McManus had been on the case for over a year. The prosecutor expressed his concern that defendant had made multiple demands to speed up the proceedings.

Defendant stated that he wanted his trial within 30 days. McManus indicated his belief that defendant did not understand what a trial was and could not be of assistance in preparing for

9

one.  McManus argued that this was not like the *Litmon*[8] case where both the client and the attorney demanded a speedy trial. He stated that some of the issues that defendant had raised, inartfully, in his writ had merit but were unique questions that required substantial research.  He believed that good cause existed to continue the matter over defendant's objection and that he was not asking for a speedy trial for defendant.

Defendant asked when he would go to trial.  The trial court responded, "As soon as your attorney tells me he's ready." Defendant told the trial court that he was "prepared to go forward with the trial" regardless of whether his attorney was ready.  The trial court thought that defendant needed to have a conversation with McManus.  Defendant claimed that the doctors had said he was not mentally ill and could leave the hospital. McManus argued that this demonstrated that defendant did not understand what was happening and his lack of competency.

The next hearing was scheduled for April 2014.  The trial court told the prosecutor to order new evaluations so that the trial could go ahead as soon as possible.

April 23, 2014, hearing

On April 23, 2014, the prosecutor reported that the updated evaluations would be completed by the first week in June 2014. He and McManus wanted to return shortly thereafter for a hearing, and asked to schedule it for June 2014.  The trial court agreed.

June 11, 2014, hearing

As a result of a calendaring error by McManus, defendant was not present at the hearing on June 11, 2014.  McManus reported that they had just received the updated evaluations.  He

---

[8]     *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon*).

10

needed more time to look at the records and talk to defendant. He also referred to "some additional defense work going on in this case." The matter was continued to August 2014.

August 5, 2014, hearing

On August 5, 2014, McManus stated that he was still working on getting certain records and asked for a short continuance. The matter was continued to September 2014.

September 18, 2014, hearing

Defendant did not appear at the hearing on September 18, 2014. McManus reported that he had "run up against some roadblocks" in getting records about recent incidents discussed in the evaluators' reports. He needed to read them, discuss them with defendant, and decide whether to hire an additional expert. The next hearing was set for November 5, 2014.[9]

November 20, 2014, hearing

Defendant was not present on November 20, 2014, because of a misunderstanding between him and McManus. McManus stated that he was going to see defendant in December 2014 and that there was still an extensive amount of work to be done on the case. He asked for a continuance at least until January 2015. The prosecutor stated that there had been "about 16 months of absolutely nothing happening in court other than" continuances. McManus attributed these difficulties to defendant's communication issues. The next hearing was scheduled for January 2015.

January 22, 2015, hearing

On January 22, 2015, the prosecutor commented that nothing other than continuances had occurred in the 21 months since McManus had been assigned to the case. McManus stated

---

[9]    There is no record of what occurred on November 5, 2014.

11

that the case was "going to take some time to prepare" and that defendant had "some serious learning difficulties." Because McManus had other high priority cases, he requested at least a three-month continuance. The trial court set the next hearing for April 2015.

April 13, 2015, hearing

On April 13, 2015, McManus stated that defendant wanted to proceed to trial but that he was not ready. McManus had at least two other cases that were scheduled for trial soon; his "caseload [had] doubled approximately six months" earlier and he had not had the opportunity to do some of the work he needed to in defendant's case. He requested that the matter be continued for about three months and then to select a trial date one to three months later.

The prosecutor was "happy to move towards trial" and would order new "evaluations whenever the [trial] court deem[ed] it efficient[.]"

Because defendant wanted to move forward, the trial court told McManus to make this case high priority and told the People to order updated evaluations.

Defendant stated that he wanted to have his trial start the next month. The trial court responded that while it "would certainly be willing to accommodate that[,]" the "problem" was that defendant's attorney had upcoming trials and that the People would also need time to get ready. It suggested that the case might go to trial in late summer or early fall. Defendant said that he was ready and that it was not his fault if his attorney was not. The trial court responded, "I understand that, but I assume you want your lawyer to be prepared when he goes to trial to try to get you released, and I want to make sure he has

12

got the time to prepare as well. We have got to give him that time."

The matter was continued to July 2015.

July 28, 2015, hearing

Defendant was not present on July 28, 2015. McManus represented that defendant said he was "okay" with a November trial date. The prosecutor reported that one of the experts on the case had retired, so they had to get another evaluation. Trial was set for November 2015.

September 10, 2015, hearing

By the September 10, 2015, hearing, the updated evaluations had been received and the People had subpoenaed experts for the upcoming trial.

McManus reported that during a recent evaluation defendant had demanded to be interviewed in English without an interpreter and had refused consent to be recorded. As a result, McManus did not know what was actually said during the interview. The parties and the trial court agreed that the evaluation should be redone.

The prosecutor commented that he and McManus had "both been trying very hard . . . to keep the trial date" and that they had "been in constant communication with each other." The trial court agreed. The next hearing was set for October 2015.

October 15, 2015, hearing

On October 15, 2015, McManus explained that two of the experts still had to interview defendant and, therefore, the parties would not be ready for trial in November 2015. McManus thought that, due to defendant's "educational and language deficits[,] he was being influenced by other people . . . at the hospital" when he was making demands to proceed to trial.

13

Based on his trial calendar, McManus did not think they would be able to set the trial until April or May 2016.

Defendant stated that he wanted his trial to start the next month. The People did not object to vacating the trial date. The next hearing was scheduled for November 2015.

November 24, 2015, hearing

On November 24, 2015, McManus reported that the updated report from one of the evaluators had been received but not the transcript of the interview. Based on his discussions with the prosecutor, the earliest McManus believed that they could hold the trial was June or July 2016. The trial court scheduled a status conference for February 2016, and for the trial to begin on July 25, 2016.

February 11, 2016, hearing

Defendant was initially present by video at the status conference on February 11, 2016, but left early on. McManus requested a continuance of the trial because he had two other trials scheduled for May and June. McManus stated, "It will simply be impossible for me to try and prepare three trials three months in a row because of the amount of work involved in it and especially in [defendant's] case." McManus reported that defendant had accepted this. The People were amenable to a short continuance.

The trial court did not change the trial date but scheduled another hearing for two weeks later so that defendant could participate and the availability of the experts could be ascertained.

February 25, 2016, hearing

Defendant was not present on February 25, 2016. The trial was reset to August 15, 2016.

14

July 19, 2016, hearing

On July 19, 2016, McManus told the trial court that, because defendant was not feeling well and was in pain, defendant wanted the trial to be postponed.  Defendant confirmed that he was not feeling well.  The People objected to any continuance.  The trial court denied the defense motion to continue and ordered the medical director at Coalinga to file a report on defendant's medical condition and treatment.

IX. *First Trial*

The trial began on August 15, 2016.

On August 31, 2016, the jury was "hopelessly deadlocked," and the trial court declared a mistrial.  It set another hearing for December 2016, and ordered defendant returned to Coalinga.

X. *Proceedings from First Trial to Retirement of Defense Counsel*

Several hearings occurred between December 2016 and March 2018; defendant was not present at any of them.

December 8, 2016, hearing

According to the prosecutor on December 8, 2016, McManus had "indicated that [defendant], after the experience, [was] not desirous of rushing pretrial[.]"  Based on McManus's request, the trial court set the next hearing for March 2017.

March 7, 2017, hearing

The transcripts from the first trial had not been received as of the March 7, 2017, hearing.  McManus stated that, even if the transcripts had been ready, the case was not likely to be tried that year.  He asked for a three or four month continuance.  The trial court scheduled the next hearing for June 2017.

June 20, 2017, hearing

Another deputy public defender appeared for McManus at the June 20, 2017, hearing.  The transcripts of the first trial had

15

still not been prepared. The trial court stated that McManus needed "to proactively move" the case forward and set the next hearing for July 2017.

July 18, 2017, hearing

Neither defendant nor McManus was present at the July 18, 2017, hearing. Another deputy public defender appeared on McManus's behalf. The trial court stated: "This is really problematic. . . . [McManus] needs to be on his cases. I cannot intelligently address requests to put cases over if I don't have counsel here. This case has been dragging out. Since December, he's been trying to get transcripts. And I have no idea what the progress of that is." The matter was continued.

August 17, 2017, hearing

The trial transcripts were not yet ready as of the August 17, 2017, hearing. McManus stated that defendant was "not requesting to go [to] trial." The next hearing was set for October 2017.

October 26, 2017, hearing

The trial transcripts were still not ready by October 26, 2017. By stipulation, the matter was continued to February 2018.

February 6, 2018, hearing

At the February 6, 2018, hearing, it was reported that the trial transcripts were not ready because the court reporter was undergoing medical treatment. With the parties' agreement, the hearing was continued.

March 19, 2018, hearing

The trial court referenced McManus's upcoming retirement at the March 19, 2018, hearing. McManus confirmed that he would not handle the retrial and did not know who was going to

replace him. The trial transcripts had not been received. The next hearing was set for the following month.

<u>April 30, 2018, hearing</u>

By April 30, 2018, McManus had retired. Another deputy public defender appeared for defendant, but he explained that the case would need to be reassigned to someone else in his office. The trial court expressed concern that the reassignment had not yet been made. Defendant repeatedly stated that he wanted his trial to take place "[a]s soon as possible." The matter was continued to June 2018.

XI. *Defendant's New Counsel; Trial Continuances*

<u>June 18, 2018, hearing</u>

On June 18, 2018, defendant's new attorney, Deputy Public Defender Christina Behle (Behle), appeared for the first time. Behle had just been assigned the case the previous week. The trial transcripts were still not complete.

The trial court acknowledged that, during his last appearance, defendant "was very unhappy and wanted his trial as soon as possible." It told defendant: "[Y]ou have to decide whether you want an unprepared lawyer to take your case to trial or you want your lawyer to be properly prepared. If she's unprepared, there is no argument on appeal that your lawyer was ineffective, if you push her to trial before you think she's ready."

Defendant stated that he did not want to waive time and wanted his trial to take place the next month. The trial court explained that it had to give defense counsel time to prepare but that counsel was "now on notice that she has to be prepared sooner rather than later." When defendant repeated that he wanted his trial as soon as possible, the trial court stated, "I have

17

to give your lawyer some time to prepare.  You are not her only client.  If you would like to privately hire a lawyer and pay for the lawyer, I'm sure the lawyer can be ready in two weeks.  The lawyer being provided to you is at public expense.  You have to accept the fact she has other clients besides you."

The next hearing was set for July 2018.

July 23, 2018, hearing

On July 23, 2018, Behle reported that she had received the trial transcripts the previous week and had contacted experts from that trial.  The trial court stated, "I think we want to have this trial sooner rather than later because [defendant] wants it without [Behle] even being prepared."  Behle explained that she had a few other cases that she needed to prepare for trial and that she was "working as hard as" she could "to get prepared." She also had "to take into consideration the expert's availability and all of the prior evaluations."

The trial court stated that it was "not inclined to force [Behle] to trial until" she was prepared.  It set another hearing for September 2018, and assumed that defendant objected to any further continuances and wanted a speedy trial.

September 24, 2018, hearing

On September 24, 2018, Behle reported that she met with defendant at Coalinga the month before.  She was doing "everything" she could to be ready for a January trial.  According to Behle, one of the People's evaluators had determined that defendant did not qualify as an SVP.  They also needed to replace the other evaluator who was no longer doing SVP evaluations, causing some uncertainty.  Because the defense expert was not available in January, Behle suggested that the trial be scheduled for February 6, 2019.  Defendant stated that he wanted his trial

18

to start on that date. The trial court responded, "In light of *Vasquez*,[10] I will probably accede to that. He wants his trial. He is getting his trial."

    November 26, 2018, hearing

    On November 26, 2018, the trial court stated that defendant had "repeatedly demanded a trial and he's going to get that trial." The trial was still set to begin on February 6, 2019.

    January 7, 2019, hearing

    On January 7, 2019, the prosecutor reported that she had prepared an order for the trial court to sign so that she could subpoena documents from Coalinga. She expected the defense to file a motion based on those documents and, therefore, was anticipating trial on March 13, 2019. The prosecutor believed good cause existed for a continuance because they did not yet have the documents that would be used during trial. They could not have sought the documents earlier because they did not know what the evaluators were relying on until they had the evaluations. Trial was set for March 13, 2019.

XII. *Retrial and Appeal*

    A bench retrial commenced on March 15, 2019. On March 29, 2019, the trial court found that defendant was an SVP and that he needed to be committed indefinitely to a state hospital.

    This timely appeal ensued.

---

**10**     *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36 (*Vasquez*). In *Vasquez*, the Court of Appeal concluded that a 17-year delay between the filing of an SVP petition and trial violated the due process right to a timely trial. (*Id.* at p. 41.)

19

**DISCUSSION**

I. *No Forfeiture*

The People argue that defendant forfeited his due process challenge by failing to file a motion to dismiss in the trial court based on pretrial delay. We disagree. Provided that a defendant objects to the delay—as defendant did here on numerous occasions—a federal constitutional claim regarding the deprivation of a timely trial is preserved even if no motion to dismiss is filed. (*People v. Bradley* (2020) 51 Cal.App.5th 32, 38–39 (*Bradley*).)[11]

II. *No Due Process Violation*

A. <u>Standard of review</u>

We review defendant's due process claim de novo. (*People v. Aguilera* (2020) 50 Cal.App.5th 894, 908 [applying the de novo standard of review to "a mixed question of law and fact that is predominantly legal"].)

B. <u>Relevant law</u>

1. *Overview of SVP commitment proceedings*

An SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Under the SVPA, the state can civilly commit an individual found to be an SVP indefinitely for confinement and appropriate treatment in a state hospital. (§ 6604.)

---

[11] Our conclusion renders moot defendant's alternative argument that, if we were to find forfeiture, his trial counsel's failure to file a motion to dismiss constituted ineffective assistance of counsel.

An SVP petition must be supported by at least two evaluations by mental health experts appointed by the Director of State Hospitals opining that the person meets the commitment criteria. (§ 6601, subds. (d)-(f); *Reilly*, *supra*, 57 Cal.4th at p. 647.) After the petition is filed, the trial court must "review the petition and determine whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the court finds that the petition is facially sufficient, it must hold a probable cause hearing within 10 days.[12] (§ 6601.5.) The probable cause hearing may be continued upon a showing of good cause. (§ 6602, subd. (b).) If probable cause is found, the subject of the petition is entitled to a trial. (§§ 6603, subd. (a), 6604.)

2. *Due process right to a timely trial*

"The SVPA does not establish a deadline by which a trial on an SVP petition must be held after the trial court finds probable cause to believe the inmate is an SVP." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 57.) Further, because it is a civil proceeding—not a criminal prosecution—the Sixth Amendment right to a speedy trial does not apply. (*Ibid.*) Nevertheless, "[b]ecause civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due

---

[12]    Here, at the first hearing following the filing of the SVP petition, defendant waived his right to have the probable cause hearing take place within 10 days. Therefore, a violation of the particular time requirement set forth in section 6601.5 is not specifically at issue in this appeal.

21

process protections." (*People v. Otto* (2001) 26 Cal.4th 200, 209 (*Otto*).) This includes the due process right to a *timely* trial.[13] (*In re Butler* (2020) 55 Cal.App.5th 614, 638 (*Butler*).)

### 3. *Tests applied to alleged due process violations*

"Neither the California Supreme Court nor the United States Supreme Court has decided what test is to be applied in deciding a due process/timely trial claim in an SVP proceeding." (*People v. Landau* (2013) 214 Cal.App.4th 1, 33 (*Landau*).) California Courts of Appeal have consistently applied the tests articulated in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*). (E.g. *Bradley*, *supra*, 51 Cal.App.5th at pp. 40–46; *Butler*, *supra*, 55 Cal.App.5th at pp. 648–664; *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806–813 (*DeCasas*); *Vasquez*, *supra*, 27 Cal.App.5th at pp. 60–82.) We do the same.

### i. <u>*Barker* test</u>

*Barker*, *supra*, 407 U.S. at 514, set forth a nonexhaustive list of four factors for courts to consider when determining whether the right to a speedy trial has been violated: (1) the length of the delay; (2) who is to blame for the delay; (3) the defendant's assertion of the right; and (4) prejudice. (*Id.* at p. 530; *People v. Williams* (2013) 58 Cal.4th 197, 233 (*Williams*).) None of these factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such

---

[13] Although the Sixth Amendment right to a speedy trial and the Fourteenth Amendment due process right to a timely trial are distinct, for the purpose of our analysis they are sufficiently analogous to be treated interchangeably. (See *Vasquez, supra*, 27 Cal.App.5th at p. 60, fn. 16.)

other circumstances as may be relevant. . . . [T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." (*Barker*, *supra*, at p. 533.)

ii. *Mathews* test

*Mathews*, *supra*, 424 U.S. 319, articulated a more general balancing test of three factors "for resolving what process is constitutionally due" (*Butler*, *supra*, 55 Cal.App.5th at p. 639): (1) the private interest affected by the government action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest. (*Mathews*, *supra*, at p. 335.) Like the *Barker* test, the *Mathews* test "involve[s] careful balancing of the competing interests . . . ." (*Litmon*, *supra*, 162 Cal.App.4th at p. 399.)

C. Analysis of the *Barker* factors

We address the *Barker* factors in the following order: the length of the delay, who is to blame for the delay, defendant's assertion of the right, and prejudice. Thereafter, we balance these factors to determine whether defendant was deprived of due process.

1. *Length of the delay*

Nearly 11 years elapsed between the filing of the SVP petition and the commencement of defendant's second trial. During that period, it took more than four years to hold a probable cause hearing and more than eight years to hold the first trial. Though not as long as the delays in some SVP cases, these substantial delays weigh in defendant's favor. (See *Butler*, *supra*, 55 Cal.App.5th at p. 648 ["it would be difficult to argue that the [13-year] delay . . . was anything other than extraordinary"]; *DeCasas*, *supra*, 54 Cal.App.5th at p. 806 [13-

year delay was "extraordinary"]; *Vasquez, supra,* 27 Cal.App.5th at p. 61 [17-year delay was "'extraordinary'"]; *Landau, supra,* 214 Cal.App.4th at p. 37 [considered in its entirety, over five-year delay was "extreme"].)

2. *Blame for the delay*

The protracted delay between the filing of the SVP petition in May 2008 and the probable cause hearing in October 2012 was mostly attributable to multiple defense motions to strike psychologist evaluations; the need for updated evaluations; the change of defense counsel from King to Tibor; and Tibor's medical problems.

There were several reasons for the span between the finding of probable cause and the start of the first trial in August 2016. Tibor retired, and McManus was assigned as defendant's new counsel. McManus had difficulties communicating with defendant, as well as a heavy case load and trial schedule. The defense made requests for additional time to research the viability of various motions. Finally, updated evaluations were required, including to replace a retired evaluator and to redo an evaluation after defendant refused the assistance of an interpreter and to be recorded.

Finally, the retrial was delayed until March 2019 primarily because of the extended time it took to obtain the first trial transcripts, ostensibly due to the court reporter's medical problems; McManus's retirement and the assignment of new counsel; and the replacement of an evaluator.

To determine where the blame lies for these delays, we consider in turn the role of the defense, the prosecution, and the trial court.

24

i. The defense

As a general rule, "delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned." (*Vermont v. Brillon* (2009) 556 U.S. 81, 94 (*Brillon*).) This rule, however, "is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State." (*Ibid.*) The United States Supreme Court "has not had occasion to explain what constitutes a breakdown in the public defender system" (*Williams*, *supra*, 58 Cal.4th at p. 245), but it has explained that "[a]n assigned counsel's failure 'to move the case forward' does not warrant attribution of delay to the State."[14] (*Brillon*, *supra*, at p. 92.)

Here, although the reasons for the delays varied, we can find no continuance in the record that was not the result of defense counsel's agreement or, more often, explicit request. Defendant does not dispute this. Rather, he argues that he should not be held responsible for the delays caused by his attorneys because they were the result of a systemic breakdown in the public defender system.

Defendant identifies specific acts by his appointed trial counsel that he contends "violated his due process rights and together, if not separately, manifest a systemic breakdown."

---

[14] Attributing to the state an assigned counsel's "'inability or unwillingness . . . to move the case forward[]'" (*Brillon*, *supra*, 556 U.S. at p. 92) "could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds. Trial courts might well respond by viewing continuance requests made by appointed counsel with skepticism, concerned that even an apparently genuine need for more time is in reality a delay tactic." (*Id.* at p. 93.)

These include: failing to take steps to ensure an earlier probable cause hearing; not timely reassigning the case when Tibor's retirement was imminent; requesting continuances to research and prepare motions that were never filed; and not timely obtaining the reporter's transcripts of the first trial.

Assuming, arguendo, the accuracy of defendant's recitation of his counsel's failings,[15] the fundamental problem with defendant's argument is that, based on the record before us, we cannot say as a matter of law that these problems demonstrate "a systemic 'breakdown in the public defender system[.]'" (*Brillon*, *supra*, 556 U.S. at p. 94.)

*Butler*, *DeCasas*, and *Vasquez*, upon which defendant relies heavily, do not compel a different result. In each of those cases, the Court of Appeal agreed with a superior court's determination that the due process right of a defendant in an SVP case to a timely trial had been violated, requiring the dismissal of the petition. (*Butler*, *supra*, 55 Cal.App.5th at p. 626; *DeCasas*, *supra*, 54 Cal.App.5th at p. 789; *Vasquez*, *supra*, 27 Cal.App.5th at p. 41.)

And, in both *DeCasas* and *Vasquez*, a superior court's specific factual finding that a systemic breakdown had occurred in the public defender's office was reviewed under the deferential

---

[15]  Although we need not evaluate the merits of each of defendant's contentions, we do question some of the inferences made by defendant. For instance, that defense counsel ultimately did not file the motions that it requested time to research and prepare does not necessarily mean that the requests were unreasonable or, worse, pretextual. We also find some of defendant's examples speculative.

abuse of discretion standard.[16] (*DeCasas*, *supra*, 54 Cal.App.5th at pp. 801, 810; *Vasquez*, *supra*, 27 Cal.App.5th at pp. 54–55, 71–74; see also *People v. Peterson* (2020) 10 Cal.5th 409, 434 [contrasting de novo review with "the deferential substantial evidence standard"].)

In all three cases, because a motion to dismiss or a petition for a writ of habeas corpus was filed and related evidentiary hearings were held, the appellate record regarding the exact causes of the delays was far more developed than we have here. (*Butler*, *supra*, 55 Cal.App.5th at pp. 634–637; *DeCasas*, *supra*, 54 Cal.App.5th at pp. 800–801; *Vasquez*, *supra*, 27 Cal.App.5th at pp. 52–54, 73.)

This case is more like *Williams*, *supra*, 58 Cal.4th 197, where the California Supreme Court considered whether a seven-year delay between a criminal defendant's arrest and the start of his trial violated his right to a speedy trial. (*Id.* at pp. 215–252.) "[T]he record indicate[d] that several of [the] defendant's attorneys appeared to make little or no progress in preparing his case for trial." (*Id.* at p. 248.)

The Supreme Court explained that its "specific focus . . . must be on whether a *systemic* breakdown ha[d] occurred, not on whether any particular attorney or attorneys performed deficiently." (*Williams*, *supra*, 58 Cal.4th at p. 248.) While it was "possible that the 'revolving door' of appointed counsel" was

---

**16** In *Butler*, neither the superior court nor the Court of Appeal resolved whether a systemic breakdown had occurred in the public defender's office. (*Butler*, *supra*, 55 Cal.App.5th at p. 658.) Nevertheless, the Court of Appeal concluded that "substantial evidence support[ed] the [superior] court's determination that the bulk of the delay may be attributed to the actions (and inactions) by the state." (*Ibid.*)

"indicative of 'institutional problems'" at the public defender's office, "the record on appeal contain[ed] no facts that affirmatively support[ed] this conclusion. Because [the] defendant did not file a motion to dismiss on speedy trial grounds in the trial court, the underlying cause of the delay . . . was never litigated, the various statements by [the] defendant and his attorneys were never examined in an adversarial proceeding, and the trial court made no findings that might inform the issue" on appeal. (*Ibid.*)

"[I]n the absence of evidence identifying *systemic* or *institutional* problems and not just problems with individual attorneys," the Supreme Court was "unable to conclude on direct appeal that the delay experienced by [the] defendant resulted from a breakdown in the public defender system." (*Williams, supra,* 58 Cal.4th at p. 249.) It was "required by *Brillon*[, *supra,* 556 U.S. 81] to charge to [the] defendant the delay . . . resulting from defense counsel's lack of progress." (*Williams, supra,* at p. 249.)

We, too, are bound by *Brillon,* as well as by *Williams.* Without a more developed factual record, we cannot make a determination whether the defense delays were justifiable, or "whether the lack of progress was attributable to each attorney's own inability to properly manage or prioritize his or her caseload, or whether the performance of individual attorneys was indicative of unreasonable resource constraints, misallocated resources, inadequate monitoring or supervision, or other systemic problems." (*Williams, supra,* 58 Cal.4th at p. 249.) Accordingly, we must attribute all delays caused by defense counsel to defendant.

## ii. The prosecution

Defendant "acknowledges that the district attorneys assigned to the case often expressed their readiness for trial and expressed displeasure with the long delays primarily caused by [defendant]'s attorneys." He nevertheless faults the prosecution with failing to make "any formal motions to relieve the public defender or to compel the trial court to set a timely trial date."[17]

Overall, the prosecution diligently prosecuted this matter and nothing in the record suggests that it engaged in deliberate delay tactics or acted in bad faith. Defendant does not specify what steps the prosecution could have taken "to compel the trial court to set a timely trial date[,]" and we need not engage in speculation.

## iii. The trial court

Defendant holds the trial court "fully responsible for virtually all the delays in [his] case." He points to various examples, including "passively grant[ing] continuance after continuance"; not setting firm trial deadlines; allowing defense counsel to repeatedly waive time over an extended period without requiring defendant to appear in court; and failing to encourage the filing of a motion for another court reporter to work on the first trial transcripts.

---

[17] Defendant also contends that the Department of State Hospitals failed to produce timely evaluations. Even if such delays could properly be charged to the prosecution, the record before us is insufficient to assess whether the delays were justifiable. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment"].)

29

We do not find reversible error in the specific examples raised by defendant—either individually or cumulatively.

"Defense counsel's lack of progress put the trial court in a difficult position." (*Williams*, *supra*, 58 Cal.4th at p. 250.) The trial court was forced to balance defendant's due process right to a timely trial with his right to competent counsel. (*Ibid.*; see also *Townsend v. Superior Court of Los Angeles* (1975) 15 Cal.3d 774, 782 ["the trial court must carefully navigate procedurally between 'the Scylla of delay and the Charybdis of ineffective and inadequate representation[]'"].) This task was further complicated by defendant's apparent failure to appreciate the potential negative effects of forcing his counsel to proceed unprepared to trial. "In granting continuances at the request of defense counsel, the trial court understandably sought to ensure adequate preparation and a fair trial" (*Williams*, *supra*, at p. 251) for defendant's direct benefit. (See *People v. Lomax* (2010) 49 Cal.4th 530, 556 [continuances to allow defense counsel to prepare benefit the defendant and are justified over a defendant's objection].)

Under these circumstances, the trial court was not directly responsible for the delays. (See *Williams*, *supra*, 58 Cal.4th at p. 251; *Vasquez*, *supra*, 27 Cal.App.5th at p. 81.)

3. *Defendant's assertion of his right*

Defendant made numerous demands to speed up the proceedings and objections to his counsel's requests for continuances. Notwithstanding several occasions where defendant agreed to the continuances, this factor weighs in defendant's favor. (See *Barker*, *supra*, 407 U.S. at pp. 531–532 ["The defendant's assertion of his speedy trial right . . . is entitled

to strong evidentiary weight in determining whether the defendant is being deprived of the right"].)

4. *Prejudice to defendant*

We assess prejudice in view of three "interests of defendants which the speedy trial right was designed to protect"—namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532.)

Nearly 11 years of pretrial incarceration is undoubtedly oppressive and would do little to minimize the anxiety and concern of the accused. (Cf. *Williams*, *supra*, 58 Cal.4th at p. 235 ["being jailed without a trial for seven years is 'oppressive[]'"].) Such a lengthy pretrial confinement itself constitutes some degree of prejudice. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 63; *Landau*, *supra*, 214 Cal.App.4th at p. 37.)

We do not find, however, that "defendant suffered the 'most serious' type of prejudice"—that is, "the inability to adequately prepare his defense [citation.]" (*Williams*, *supra*, 58 Cal.4th at p. 236.) Defendant argues that because, at one point, a state evaluator opined that defendant was not an SVP but later "changed his mind and testified as a rebuttal witness[,]" a total of four evaluators testified against defendant "instead of the two there would have been had [defendant] been brought to trial at an earlier time." While this may have affected the overall weight of the evidence against defendant at trial, he does not explain—nor can we discern—how this impeded his ability to adequately prepare his defense.

We "recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party

31

can prove or, for that matter, identify." (*Doggett v. United States* (1992) 505 U.S. 647, 655.) Here, however, defendant "cannot benefit from a presumption of prejudice because the record does not show that the state was responsible for the delay." (*Williams*, *supra*, 58 Cal.4th at p. 252.)

5. *Balancing of factors*

The length of the delay and defendant's assertion of his right weigh in his favor. The other factors do not. As discussed above, the various continuances were almost entirely at the request of the defense and, to the extent that they were granted to allow defense counsel time to prepare or for new evaluations to be completed, they were intended for defendant's direct benefit. We are not reviewing a factual finding of a systemic breakdown of the public defender system, and we make no such finding independently. Defendant must therefore bear responsibility for the delays. And, because defendant has not demonstrated that his ability to prepare his defense was adversely affected by the delays, he has not shown that he suffered the most serious form of prejudice.

Balancing these factors, defendant's due process right to a timely trial was not violated.

D. Analysis of the *Mathews* factors

We address the *Mathews* factors in the following order: the private interest affected, the risk of erroneous deprivation of that private interest, and the government's interest. And, we apply a balancing test to determine whether defendant's due process right was violated, as we did when evaluating the *Barker* factors.

1. *Private interest affected*

Defendant was subjected to a significant curtailment of his liberty during his extended pretrial detention. "The right to be

free from involuntary confinement is fundamental and deprivation of this right requires due process." (*Bradley, supra*, 51 Cal.App.5th at p. 44.)

### 2. *Risk of erroneous deprivation*

Any risk of an erroneous deprivation was mitigated by the procedural safeguards required by the SVPA. Specifically, the initial SVP petition had to be supported by evaluations by mental health experts concluding that defendant met the SVP commitment criteria. (§ 6601, subds. (d)-(f).) Defendant received a probable cause hearing and, throughout the life of the case, he was reevaluated numerous times to assess whether he still met the SVP criteria.[18]

### 3. *Government's interest*

There is no question that "the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a substantial danger of committing similar new crimes [citations] . . . ." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 924; see also *Otto, supra*, 26 Cal.4th at p. 214 ["The express purpose of the SVPA articulates the strong government interest in protecting the public from those who are dangerous and mentally ill"].)

---

[18] In his discussion of this factor, defendant does not identity any additional or substitute procedural safeguards that could have been employed. (See *Mathews, supra*, 424 U.S. at p. 335.)

### 4. *Balancing of factors*

We reach the same conclusion weighing the *Mathews* factors as we did with the *Barker* factors: Defendant's right to due process was not violated.

Any risk of an erroneous deprivation of defendant's liberty was reasonably mitigated by the procedural requirements of the SVPA. The state's compelling interest in protecting society from the risk defendant posed to it is entitled to significant weight and tips the scales in favor of our finding that defendant was provided with all the process that he was due.

### DISPOSITION

The judgment is affirmed.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ

Filed 3/23/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B297845 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM013245) |
| v. | |
| SON TRAN, | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on March 2, 2021, was not certified for publication in the Official Reports.

For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

LUI, P. J.        ASHMANN-GERST, J.        CHAVEZ, J.